IN THE UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF MISSOURI
EASTERN DIVISION

DREW E. BURBRIDGE and )
JENNIFER L. BURBRIDGE, )
                                        )
             Plaintiffs, )
                                        )
v.                                      )          Cause No. 4:17-cv-02482-SRC
                                        )
CITY OF ST. LOUIS, MISSOURI, )
et. al., )
                                        )
             Defendants. )

## MEMORANDUM IN OPPOSITION TO DEFENDANTS' MOTION FOR SUMMARY JUDGMENT

On September 17, 2017, Drew Burbridge and his wife Jennifer Burbridge
were peacefully video-documenting the civil unrest and police response in downtown
St. Louis in the wake of Police Officer Jason Stockley's acquittal. The Burbridges
were singled out by the police for their documentation efforts and Drew was ripped
away from his wife. Drew Burbridge was thrown to the ground by officers, and then
without cause or legal justification maced twice by Sgt. Brian Rossomanno. Officers
Burton and Rachas assaulted Drew Burbridge, while Officer Biggins held his legs.
Drew Burbridge was subsequently arrested, charged, and jailed. During this time,
Jennifer Burbridge, also present at the scene and targeted because of her role as a
documentary filmmaker, was maced, witnessed her husband's assault, and was
then arrested, charged, and jailed. During her incarceration, she was forced to
submit to a degrading and unnecessary pregnancy test.

There was no probable cause or legal justification for the mass arrest or the arrest of the Burbridges. The evidence shows that Sgt. Rossomanno used excessive force in macing Drew Burbridge. There is a question of material fact regarding the conduct and use of force of the other officers in the arrest of Drew which must be submitted to a jury. Furthermore, the officers involved with the detention and arrest of Drew Burbridge demonstrated a complete lack of training by their Department on (a) how to respond to such civil unrest, (b) the legal and appropriate use of force; and (c) their special orders. The conduct of these officers in particular, and the conduct of a large number of the S.L.M.P.D. officers on scene that night, evidence a poisonous culture and pattern and practice of police who operate without regard to the laws or the U.S. Constitution. Whether the police officer defendants (including but not limited to Sgt. Brian Rossomanno) utilized appropriate force is a question for the jury. Whether the City failed in its duty to train these officers is also a question for the jury. The pregnancy test of Jennifer Burbridge was an illegal search and seizure within the meaning of the 4th Amendment and without justification.

Sgt. Rossomanno, Officers Burton, Rachas, and Biggins, the City of St. Louis and its police department must not be allowed to escape liability for the deliberate and indifferent violations of the plaintiffs' civil rights. The defendants' motion should be denied and this matter should be allowed to proceed to trial on all counts.

# TABLE OF CONTENTS

Table of Authorities……………………………………………………….……4

Response to Defendants' Statement of Uncontroverted Material Fact …………….. 9

Plaintiff's Additional Statements of Material Fact …………………………….....11

    I.     Lawful assembly in the City of St. Louis …………………………12
    II.    The attendance of the Burbridges ……………………………… 13
    III.   The detention, assault, and arrest of Drew Burbridge ……………16
    IV.   The detention, assault, and arrest of Jennifer Burbridge …….…....19
    V.    The S.L.M.P.D. Special Order on use of force and chemicals ……...21
    VI.   The S.L.M.P.D. violation of its special orders ……………………23
    VII.  Training of the police officer defendants …………………………24
    VIII. Multiple examples of similar conduct by S.L.M.P.D. officers ………27
    IX.   Other litigation stemming from the *Stockley* unrest …………….....28
    X.    S.L.M.P.D. response on September 17, 2017, chills free speech ….....30

Discussion …………………………………………………………………… 31

    A.  Standard of review……………………………………………….... 31
    B.  Fourth Amendment violations (Count III) ……………………… 31
        i.     *Monell* liability ……………………………………… 34
        ii.    Qualified immunity …………………………………… 38
    C.  Failure to train (Count IX) ……………………………………41
    D.  Freedom of Speech and First Amendment retaliation (Counts I & II) ...43
    E.  Procedural Due Process (Count IV) ………………………….....46
    F.  Conspiracy to deprive civil rights (Count XI) …………………49
        i.     Intracorporate conspiracy doctrine ……………………50
        ii.    Sufficient evidence ……………………………………51
        iii.   Underlying Constitutional claim ………………………51
    G.  State law claims …………………………………………52
        i.     No official immunity ………………………………… 52
        ii.    Arrests were unlawful …………………………………53

Conclusion ………………………………………………………………… 53

List of exhibits ……………………………………………………………… 55

## TABLE OF AUTHORITIES

**Cases Cited**                                                              **Page(s)**

*Abdullah v. County of St. Louis, Mo.*, 52 F. Supp. 3d 936 (E.D. Mo. 2014) ..............35

*Adams v. Metiva*, 31 F.3d 375 (6th Cir.1994)...........................................................39, 41

*Agristor Leasing v. Farrow*, 826 F.2d 732 (8th Cir. 1987) ...................................31

*Am. Civil Liberties Union of Illinois v. Alvarez*, 679 F.3d 583 (7th Cir. 2012) ........44

*Ambrose v. Young*, 474 F.3d 1070 (8th Cir.2007) ................................................41

*Andrews v. Fowler*, 98 F.3d 1069 (8th Cir.1996) ................................................42

*Bauer v. Norris*, 713 F.2d 408 (8th Cir. 1983) ....................................................33

*Blazek v. City of Iowa City*, 761 F.3d 920 (8th Cir. 2014) ..................................38

*Boos v. Barry*, 485 U.S. 312 (1988) ...................................................................43

*Brendlin v. California*, 551 U.S. 249 (2007) ......................................................32

*Brown v. City of Golden Valley*, 574 F.3d 491, 499 (8th Cir. 2009) ..................32, 33

*Chambers v. Pennycook*, 641 F.3d 898 (8th Cir. 2011) ......................................39

*City of Canton, Ohio v. Harris*, 489 U.S. 378 (1989) .........................................41

*City of Chicago v. Morales*, 527 U.S. 41 (1999) .................................................47

*City of Houston, Tex. v. Hill*, 482 U.S. 451 (1987) .............................................45

*Davis v. White*, 794 F.3d 1008 (8th Cir. 2015) ..................................................52

*De Jonge v. Oregon*, 299 U.S. 353 (1937) .........................................................44

*Economy Housing Co. v. Continental Forest Products, Inc.,* 757 F.2d 200 (8th Cir. 1985) ........................................................................................................................31

*FCC v. Fox Television Stations, Inc.*, 567 U.S. 239 (2012) ................................47

*First Security Savings v. Kansas Bankers Surety Co.*, 849 F.2d 345 (8th Cir. 1988) .........................................................................................31

*Fontana v. Haskin*, 262 F.3d 871 (9th Cir. 2001) ..............................................39

*Foster v. Johns-Manville Sales Corp.,* 787 F.2d 3902 (8th Cir. 1986) ...................31

*Glik v. Cunniffe,* 655 F.3d 78 (1st Cir. 2011) ...................................................44

*Graham v. Connor*, 490 U.S. 386 (1989) ........................................................32

*Grayned v. City of Rockford*, 408 U.S. 104 (1972) ......................................47, 48

*Guite v. Wright*, 147 F.3d 747 (8th Cir. 1998) ................................................39

*Hartman v. Moore*, 547 U.S. 250 (2006) ........................................................45

*Henderson v. Munn*, 439 F.3d 497 (8th Cir. 2006) ..........................................32

*Holloway v. Lockhart*, 813 F.2d 874 (8th Cir. 1987) ........................................31

*Holscher v. Mille Lacs Cnty*, 924 F.Supp.2d 1044 (D. Minn. 2013) ......................42

*Hoyland v. McMenomy*, 869 F.3d 644, 655 (8th Cir. 2017) ...........................44, 45

*Johnson v Bd. of Police Comm'rs,* 351 F. Supp. 2d 929 (E.D.Mo 2004) ...............35

*Johnson v. Douglas Cnty. Med. Dept.*, 725 F.3d 825 (8th Cir.2013) ....................35

*Kelly v. City of Omaha,* 813 F.3d 1070 (8th Cir. 2017) .....................................50

*Kolender v. Lawson*, 461 U.S. 352, 357-358 (1983)....................................47, 48

*Krout v. Goemmer,* 583 F.3d 557 (8th Cir. 2009) ............................................33

*Kuha v. City of Minnetonka*, 365 F.3d 590 (8th Cir. 200....................................35

*L.L. Nelson Enters., Inc. v. County of St. Louis, Mo.*, 673 F.3d 799 (8th Cir. 2012) .50

*Lambert v. City of Dumas*, 187 F.3d 931 (8th Cir.1999).....................................40

*Laney v. City of St. Louis*, 2019 U.S. Dist. LEXIS 97510 (E.D.Mo.) .............8, 29, 53

5

*McDorman v. Smith*, 2005 U.S. Dist. LEXIS 15964 (N.D. Ill. 2005) ....................50

*Miller v. Smith*, 220 F.3d 491 (7th Cir. 2000)...................................................39

*Monell v. New York City Dep't of Soc. Servs.*, 436 U.S. 658 (1978)......................35

*Murray v. Lene*, 595 F.3d 868 (8th Cir. 2010)...............................................49

*NAACP v. Claiborne Hardware Co.*, 458 U.S. 886 (1982)................................44

*Naucke v. City of Park Hills*, 284 F.3d 923 (8th Cir. 2002)...............................45

*New York Times Co. v. Sullivan*, 376 U.S. 254 (1964)......................................43

*Newsome v. James*, 2000 U.S. Dist. LEXIS 5678 (N.D. Ill. 2000) ......................50

*Palmer v. Sanderson,* 9 F.3d 1433 (9th Cir.1993).............................................39

*Pembaur v. City of Cincinnati*, 475 U.S. 469 (1986)........................................35

*Peterson v. Kopp*, 754 F.3d 594 (8th Cir. 2014)...............................................45

*Phelps v. Coy*, 286 F.3d 295 (6th Cir. 2002)...................................................39

*Phelps-Roper v. City of Manchester, Mo.,* 697 F.3d 678 (2012) ..........................46

*Phelps-Roper v. Nixon*, 545 F.3d 685 (8th Cir. 2008) ......................................46

*Reasonover v. St. Louis City., Mo.,* 447 F.3d 569 (8th Cir. 2006) ........................52

*Smith v. City of Cumming*, 212 F.3d 1332 (11th Cir. 2000)...............................44

*Stahl v. City of St. Louis, Mo.,* 687 F.3d 1038, 1041 (2012) ...............................47

*State ex rel. Twiehaus v. Adolf,* 706 S.W.2d 443 (Mo. 1986) ..............................52

*Szabla v. City of Brooklyn Park*, 486 F.3d 385 (8th Cir.2007) ...........................42

*Treats v. Morgan,* 308 F.3d 868 (8th Cir. 2002)...............................................39

*Ulrich v. Pope Cty.,* 715 F.3d 1054 (8th Cir. 2013) ........................................41

*United States of America v. Dustin Boone, et al.*, Cause No. 4:18-CR-00975 ...8, 29

*United States v. Grace*, 461 U.S. 171 (1983) …………………………………………....43

*Wealot v. Brooks*, 865 F.3d 1119 (8th Cir. 2017) …………………………………………52

*White v. McKinley*, 519 F.3d 806 (8th Cir. 2008) …………………………………………49


**Statutes Cited**                                                          **Page(s)**

42 U.S.C. § 1983 …………………………………………………………………………49

42 U.S.C. § 1985 …………………………………………………………………………48

**Other Sources**                                                            **Page(s)**

Rule 56 of the Federal Rules of Civil Procedure  Fed.R.Civ.P. 56(c)……………29

**Other Related Litigation pending in The United States District Court (EDMO)**

*Ahmad, et al. v. City of St. Louis, et al.,* Cause No. 4:17 CV 2455

*Aldridge v. City of St. Louis, et al.,* Cause No. 4:18-CV-01677

*Alston v. City of St. Louis, et al.,* Cause No.  4:18-CV-01569

*Brandy v. City of St. Louis, et al.,* Cause No. 4:18-CV-01674

*Baude v. City of St. Louis, et al.,* Cause No. 4:18-CV-01564

*Brown v. City of St. Louis, et al.,* Cause No. 4:18-CV-01676

*Davis v. City of St. Louis, et al.,* Cause No. 4:18-CV-01574

*DeMian v. City of St. Louis, et al.,* Cause No. 4:18-CV-01680

*Dreith v. City of St. Louis, et al.,* Cause No. 4:18-CV-01565

*Faulk v. City of St. Louis, et al.,* Cause No. 4:18-CV-00308

*Gray v. City of St. Louis, et al.,* Cause No. 4:18-CV-01678

*Green v. City of St. Louis, et al.,* Cause No. 4:18-CV-01629

*Gullet v. City of St. Louis, et al.,* Cause No. 4:18-CV-01571

*Kennedy v. City of St. Louis, et al.,* Cause No. 4:18-CV-01679

*Laird, et al. v. City of St. Louis, et al.,* Cause No. 4:18-CV-01567

*Laney v. City of St. Louis, et al.,* Cause No. 4:18-CV-01575

*Nelson, et al. v. City of St. Louis, et al.,* Cause No. 4:18-CV-01561

*Newbold v. City of St. Louis, et al.,* Cause No. 4:18-CV-01572

*Ortega v. City of St. Louis, et al.,* Cause No. 4:18-CV-01576

*Robertson v. City of St. Louis, et al.,* Cause No. 4:18-CV-01570

*Rose v. City of St. Louis, et al.,* Cause No. 4:18-CV-01568

*Thomas v. City of St. Louis, et al.,* Cause No.  4:18-CV-01566

*United States of America v. Boone, et al.*, Cause No. 4:18-CR-00975.

*Ziegler v. City of St. Louis, et al.,* Cause No. 4:18-CV-00308

## RESPONSE TO DEFENDANTS'
## STATEMENT OF UNCONTROVERTED MATERIAL FACTS

The facts set forth by the defendants in paragraphs 1-4, 17-18, 21, 22, 24-27, 36-42, 50-63 of Doc. 90 are uncontroverted by these plaintiffs for purposes of this motion. Paragraphs 6-16 deal with events preceding the allegations set forth in the Third Amended Complaint and are not relevant to the allegations of these plaintiffs so are admitted to be uncontroverted for purposes of this motion.

The following paragraphs of the defendants' statement are controverted and give rise to questions of material facts which merit a trial by jury:

- ¶5, 19, 20: Neither Drew nor Jennifer witnessed anyone engaging in property damage around Washington & Tucker. [**Ex. 1**, Deposition of Drew Burbridge 108:8-10]. [**Ex. 2**, Deposition of Jennifer Burbridge 33:18-20]. There is no allegation and that either Drew or Jennifer engaged in property damage or violent acts. Furthermore, whether or not the actions of other citizens engaged in "**significant** acts of property damage and violent acts" (emphasis added) is a disputed fact and should be left for the jury to decide.

- ¶23: There was no evidence that anyone at the corner of Washington and Tucker on September 17, 2017, was throwing objects or acting in a mob and menacing mentality.

- ¶¶28-35: While the City claims dispersal orders were given, as set forth below the Plaintiffs did not hear any dispersal orders, and indeed were denied egress from the kettle at one point.

9

- ¶¶43-49: The City's entire version of the interaction between Drew and the police officers is in dispute, as set forth more fully below. The videos of the event [**Defendants Ex. J and K, Plaintiffs' Ex. 3**] as well as the testimony of Drew and Jennifer Burbridge refute these paragraphs.

Pursuant to Local Rule 7-4.01, in the following additional statement of material facts the Plaintiffs will provide specific references to portions of the record, where available, upon which the plaintiffs rely in making the above denials.  All disputed facts will reference the paragraph number from movant's listing of facts by way of footnote reference.

## PLAINTIFFS' ADDITIONAL STATEMENT OF MATERIAL FACTS

On Sunday, September 17, 2017[1], in the wake of the acquittal of police officer Jason Stockley, the S.L.M.P.D. employed a tactic known as "kettling," trapping protestors (as well as members of the media, legal observers, curious residents who lived nearby, pedestrians out for a walk, and an undercover police officer) in the intersection of Washington and Tucker Avenues. [**Ex. 4**, Rose Declaration; **Ex. 5**, Franks Declaration; **Ex. 6**, Street Declaration; **Ex. 7**, Davis Declaration; **Ex. 8**, Rice Declaration; **Ex. 9**, Ziegler Declaration; **Ex. 10**, Newbold Declaration; **Ex. 11**, Nelson Declaration; **Ex. 12**, Baude Declaration; **Ex. 13**, Maclean Declaration]. The officers came ready for a fight as they wore personal protective equipment, gas masks and helmets, and they carried full-body shields and batons. [**Defendants Ex. J and K, Plaintiffs' Ex. 3**]. Though there was no threat to their safety, they fanned out along each of the crosswalks, cutting off all routes of egress, and then rushed and arrested the hundred or so people who got caught inside the kettle. *Id.* Officers sprayed arrestees who were already compliant, subdued, and kneeling or lying on the ground. *Id.* Many of the arrestees sustained serious injuries. [See also **Ex. 14**,

---

[1] A comprehensive history of the events that gave rise to the *Stockley* protests and the night of September 17, 2017, is set forth both in Judge Perry's memorandum and order of preliminary injunction in *Ahmad v. City of St. Louis, et al.*, Cause No. 4:17-cv-02455-CDP (Doc. 57, pp.2-27). [**Exhibit 49**]. Those are the same operative facts which give rise to the claims of the Plaintiffs in this matter.

Molina Declaration]. The officers did not provide to the people adequate warning or opportunity to disperse. [**Exs. 4-13**]. The police began chanting "Whose streets? Our streets!" after they had arrested the nonviolent people they had trapped and subdued. [**Ex. 9**, Ziegler Declaration; **Ex. 15**, Lewczuk Declaration].

I.  **Lawful assembly in the City of St. Louis.**

St. Louis City Ordinance 15.52.010 defines an unlawful assembly as follows:

> Any two persons who shall, in this City, assemble together, or, being assembled, shall act in concert to do any unlawful act with force or violence, against the property of this City, or the person or property of another, or against the peace or to the terror of others, and shall make any movement or preparation therefor, and every person present at such meeting or assembly, who shall not endeavor to prevent the commission or perpetration of such unlawful act, shall be guilty of a misdemeanor.

[**Ex. 16**]. Missouri state law defines unlawful assembly in relevant part as follows:

> A person commits the offense of unlawful assembly if he or she knowingly assembles with six or more other persons and agrees with such persons to violate any of the criminal laws of this state or the United States with force or violence.

§574.040 R.S.Mo.

As relevant to the instant motion, St. Louis City Ordinance 17.16.275 prohibits people from congregating in public places in such a manner as to obstruct, impede, interfere, hinder, or delay vehicular or pedestrian traffic. [**Ex. 17**]. Any

12

person who impedes traffic and refuses to obey an order to disperse, clear or otherwise move is guilty of failing to obey a dispersing order, a Class A misdemeanor. [*Id*].

> Mo. Rev. Stat. § 574.060 states in relevant part as follows:
>
> A person commits the offense of refusal to disperse if, being present at the scene of an unlawful assembly . . . he or she knowingly fails or refuses to obey the lawful command of a law enforcement officer to depart from the scene of such unlawful assembly . . . .

Lt. Sachs testified that an individual officer can decide, in his or her discretion, to declare an unlawful assembly, and there are no guidelines, rules, or written policies with respect to when an unlawful assembly should be declared. [**Ex. 18**, 61:17-25, 62-64]. Lt. Sachs further testified that it was the custom or policy of the police department to permit an officer to declare an unlawful assembly if there is any criminal activity taking place, even in the absence of force or violence, depending upon the circumstances. *Id*.

## II. The attendance of the Burbridges at the civil gathering on September 17, 2017, and the events leading up to their arrest.

On September 17, 2017, around 11pm, Drew Burbridge and his wife arrived in downtown St. Louis, near the intersection of Washington and Tucker, to observe and document the civil unrest resulting from the acquittal of Police Officer Jason Stockley. [**Ex. 1,** Deposition of Drew Burbridge 34:12-20, 36:6-9]. Upon their arrival, the Burbridges observed a group of about 100 protestors demonstrating, marching, and some just standing around. [**Ex. 1**, Deposition of Drew Burbridge 37:2-8, 38:17-

13

20, 44:2-17]. Neither Drew nor Jennifer witnessed anyone engaging in property damage.[2] [**Ex. 1**, Deposition of Drew Burbridge 108:8-10]. [**Ex. 2**, Deposition of Jennifer Burbridge 33:18-20]. On their way into the demonstration, Drew and Jennifer walked past a number of police officers, none of whom told them they could not be in the area or had to leave. [**Ex. 1**, Deposition of Drew Burbridge 40:15-20, 41:7-21, 43:19-22]. The Burbridges then began videoing the activities of the protestors. [**Ex. 1**, Deposition of Drew Burbridge 39:5-12].

Sometime around midnight, multiple lines of police officers started gathering around the intersection of Washington and Tucker. [**Ex. 1**, Deposition of Drew Burbridge 45:9-25]. Colonel Leyshock admits that at this time of the night many individuals had dispersed the area, and the property destruction and other violent behavior seemed to have waned.[3] [**City Ex. D**¶51]. Drew Burbridge cannot remember any police orders to disperse but remembers that no officers gave him any orders or instructions.[4] [**Ex. 1, 33:10-14, 43:19-21**]. Jennifer Burbridge did not hear any dispersal orders. [5] [**Ex. 2,** 33:24-25, 34:1-7]. Police began banging their batons on their riot shields and encircled a gathering of citizens (including the Burbridges) at the intersection of Washington and Tucker. [**Ex. 3,** Videos; **Ex. 1**, Deposition of Drew

---

[2] This refutes ¶¶5, 19 & 20 of Defendants Statement of Uncontroverted Material Facts (Doc. 90).

[3] This refutes ¶¶5, 19 & 20 of Defendants Statement of Uncontroverted Material Facts (Doc. 90).

[4] This refutes ¶¶28-35 of Defendants' Statement of Uncontroverted Material Facts. While the City claims dispersal orders were given, as set forth below the Plaintiffs did not hear any dispersal orders, and indeed were denied egress from the kettle at one point.

[5] This refutes ¶¶28-35 of Defendants' Statement of Uncontroverted Material Facts. While the City claims dispersal orders were given, as set forth below the Plaintiffs did not hear any dispersal orders, and indeed were denied egress from the kettle at one point.

Burbridge 35:6-10]. At that point the Burbridges identified themselves as being part of the media and attempted to leave the area but were told by police they could not. [**Ex. 1**, Deposition of Drew Burbridge 45:9-25, 46:1-25, 47:1-8]. Having been denied egress, the Burbridges began to feel fear and panic. [**Ex. 1**, Deposition of Drew Burbridge 47:11-13]. Police on all sides of the crowd then started chanting "move back" and forcing the citizens to sit down in a circle on the ground. [**Ex. 3,** Videos; **Ex. 1**, Deposition of Drew Burbridge 47:14-23]. The Burbridges complied with the instructions of the police, turned off their camera, and sat down on the sidewalk. [**Ex. 1**, Deposition of Drew Burbridge 48:4-15, 49:11-14].

Despite compliance by the crowd, police then began indiscriminately spraying pepper spray over the compliant, sitting crowd. [**Ex. 3** Videos; **Ex. 1**, Deposition of Drew Burbridge 49:21-24, 51:20-24, 52:1-05, 66:1-24, 112:15-25, 113:1-7]. Sgt. Rossomanno identified at least four incidents of mace deployment at the street corner that night. [**Ex. 19**, Deposition of Sgt. Rossomanno 73:3-25].  Sgt. Rossomanno identifies Lt. Kiphart as having been an individual he could identify from the videos deploying mace over the crowd. [**Ex. 19**, Deposition of Sgt. Rossomanno 63:4-25; 64:1-7]. Drew could hear, feel, and taste the indiscriminately deployed pepper spray. [**Ex. 1**, Deposition of Drew Burbridge 66:1-24]. Drew never heard an announcement or warning that chemical weapons would be used. [**Ex. 1**, Deposition of Drew Burbridge 113:11-21]. Trying to mitigate the pepper spray, the Burbridges put their shirts over their faces. [**Ex. 1**, Deposition of Drew Burbridge 49:25, 50:1-3].

### III. The detention, assault, and arrest of Drew Burbridge[6].

At this point, Drew hears an officer say "that's him", "do you want to take my picture now, motherfucker", and "do you want me to pose for you." [**Ex. 1**, Deposition of Drew Burbridge 50:5-13, 51:3-8, 111:1-5]. Then two police officers (later identified as Officers Rachas and Burton)[7] drug him away from his wife by his arms. [**Ex. 1**, Deposition of Drew Burbridge 50:5-13, 51:3-8, 111:1-5]. The officers testified they detained Drew Burbridge because they were ordered to do so. [**Ex. 20**, Deposition of P.O. Rachas 18:21-24]. The officers did not see Drew violate the law in any way [**Ex. 20**, Deposition of P.O. Rachas 19:2-4, 33:6-10], nor did Drew threaten or assault them [**Ex. 20**, Deposition of P.O. Rachas 19:5-8]. At the time he was removed from the crowd, Drew was not displaying any type of active threat to the officers. [**Ex. 20**, Deposition of P.O. Rachas 32:5-7 & 25, 33:1-5]. Officer Rachas had no reasonable suspicion or probable cause to believe that Drew had violated any law. [**Ex. 20**, Deposition of P.O. Rachas 33:11-13, 34:11-14]. At no time from his selection by Officer Rachas or Officer Burton to him being put prone did Drew resist the police. [**Ex. 20**, Deposition of P.O. Rachas 34:18-20]. At no time did Officer Rachas feel threatened by Drew or feel the need to call for assistance of aid. [**Ex. 20**, Deposition of P.O. Rachas 35:18-24].

---

[6] The facts and exhibits set forth in this subsection directly controvert the City's version of events as set forth in ¶¶42-49 of the City's Statement of Uncontroverted Material Facts (Doc. 90).

[7] Both officers admit that they are the officers who are on video pulling Drew away from his wife. (**Exhibit 20** - Deposition of P.O. Rachas, 14:3-17).

Drew protested to Officers Rachas and Burton that he was not a protestor, was not resisting, and was a member of the media. [**Ex. 1**, Deposition of Drew Burbridge 50:5-13, 51:9-16, 52:8-16, 54:4-8, 114:1-11]. No police officer instructed Drew to stop using force (or otherwise resisting.) [**Ex. 1**, Deposition of Drew Burbridge 115:19-22]. Drew was restrained, slammed into the ground, had a knee placed on his neck, was repeatedly struck by officers - kicked with a boot, hit in the back of the head, on the ribs, on his shoulder - and at one point lost consciousness. [**Ex. 1**, Deposition of Drew Burbridge 52:17-25, 53-61, 74:8-20, 96:8-23].

While on the ground with Officers Rachas and Burton on top of him, Sgt. Rossomanno bent down and twice deployed mace in Drew's face. [**Ex. 3**, video of assault]. Neither Officers Burton nor Rachas asked for Sgt. Rossomanno's assistance in effecting Drew's arrest. [**Ex. 19**, Deposition of Sgt. Rossomanno 65:7-13].

While the video clearly shows Sgt. Rossomanno applying mace to Drew (the stream of mace can both be seen and heard in the enhanced video), Sgt. Rossomanno testified that he does not recall using mace or chemical foggers on Sunday, September 17, 2017. [**Ex. 19**, Deposition of Sgt. Rossomanno 49:14-16; 64:20-25]. Sgt. Rossomanno does identify himself on the video as the individual bending down with the fogger, and claims that he observed Drew actively resisting the officers (Rachas and Burton) and bent over with the intent of applying some mace to help get compliance, but claims that he saw Drew had already been maced

so he thought it would be redundant to do it again. [**Ex. 19**, Deposition of Sgt. Rossomanno 62:21-25; 63:1-10; 66:15-22].

The City has provided video from the S.L.M.P.D. Documentation Team which depicts the assault and macing of Drew Burbridge (Defendant's Exhibit J). An enhanced copy of this video also is being provided to the Court as **Ex. 3**.[8]

Officers Rachas and Burton can be seen center screen wrestling Drew to the ground at approximately the 10-second mark. Sgt. Rossomanno's macing of drew can be seen at the 00:12-00:16 mark. [**Ex. 3**].

Photos of the injuries to Drew's body after the event clearly show bruising and contusions suffered as a result of this assault **Ex. 21** (See also **Ex. 1** Deposition of Drew Burbridge 114:21-25, 115:1-14)**.** Additionally, photographs taken by the Department during Drew's arrest show his face stained orange with chemical mace residue. [**Ex. 22**].

Drew's wife Jennifer witnessed her husband being maced, stomped on, and hit on the head. [**Ex. 2**, Deposition of Jennifer Burbridge 38:18-25; 39:1-4, 17-24; 40:2-20].

After the macing and assault, Drew was subsequently taken into custody [**Ex. 22,** Photo of Burbridge Arrest], charged with "failure to disperse" [**Ex. 23**, Citation of Arrest], and booked at the St. Louis City Justice Center. [**Ex. 1**, Deposition of Drew Burbridge 76:6-9]. Drew was not allowed to wash the mace from his face, provided

---

[8] This enhancement was created from the original video produced by the City through discovery (labeled as City_0288).

any medical treatment, or provided a change of clothing, either before he got to the jail nor at the jail. [**Ex. 1**, Deposition of Drew Burbridge 85:14-24, 86:4-15, 88:10-12, 93:25, 94:1-2, 116:7-19, 119:2-16]. Drew was never charged with resisting arrest. [**Ex. 1**, Deposition of Drew Burbridge 116:5-6]. Drew sustained physical injuries aside from the macing as a result of this assault. [**Ex. 21**, Injury Photos].

   None of the police officers who arrested or assaulted Drew Burbridge filed a "use of force" report. [**Ex. 24**, Deposition of P.O. Burton 13:10-20; **Ex. 19**, Deposition of Sgt. Rossomanno 60:4-6, 67:2-15; **Ex. 25**, Deposition of Det. Wyms 71:11-20].

## IV. The detention, assault, and arrest of Jennifer Burbridge.

   On the night of September 17, 2017, Jennifer recalls arriving downtown shortly after 11pm. [**Ex. 2**, Deposition of Jennifer Burbridge 28:14-18]. The Burbridges were interviewing several of the attendees. [**Ex. 2**, Deposition of Jennifer Burbridge 32:12-13, 24-25; 34:14-25, 35:1-3]. Jennifer does not recall anyone throwing materials at the police or threatening the police in any way. [**Ex. 2**, Deposition of Jennifer Burbridge 33:11-23]. Jennifer did not hear any dispersal orders or warnings regarding the use of chemical munitions. [**Ex. 2**, Deposition of Jennifer Burbridge 34:2-7]. As Drew was filming a line of police officers, they started to bang their batons and move toward the crowd. [**Ex. 2**, Deposition of Jennifer Burbridge 35:4-8, 15-24]. At this time, the Burbridges went to the police, identified themselves as members of the media, and asked to leave. [**Ex. 2**, Deposition of Jennifer Burbridge 35:15-24]. Having been denied the right to exit the scene, the Burbridges moved to the corner of the intersection, got down on the ground, and

complied with police orders. [**Ex. 2**, Deposition of Jennifer Burbridge 36:3-15]. While Jennifer was on the ground, in compliance with police orders, she experienced an indiscriminate blast of mace over her head which caused her to cough, caused trouble breathing, and irritated her eyes and throat. [**Ex. 2**, Deposition of Jennifer Burbridge 36:14-15; 37:16-20]. Then, Jennifer witnessed her husband being pulled away from her and maced. [**Ex. 2**, Deposition of Jennifer Burbridge 38:20-21].

Jennifer was then grabbed, pulled up halfway, zip tied, and dragged away. [**Ex. 2**, Deposition of Jennifer Burbridge 39:5-24]. One of the officers transporting Jennifer remarked to another officer "Look who I have" while another said "Did you like that? Come back again tomorrow and we'll do it again" and yet another commented "What did you think would happen". [**Ex. 2**, Deposition of Jennifer Burbridge 40:20-24; 41:4-5]. Jennifer was subsequently taken into custody [**Ex. 26,** Photo of Burbridge Arrest], charged with "failure to disperse" [**Ex. 27**, Citation of Arrest], and booked at the St. Louis City Justice Center. [**Ex. 2**, Deposition of Jennifer Burbridge 45:15-17].

Prior to her release, Jennifer was subjected to a pregnancy test which she was forced to conduct in a cell with other female detainees. [**Ex. 2**, Deposition of Jennifer Burbridge 49:10-14, 18-25; 50:2-24]. The detainees were told that everyone would have to take a pregnancy test prior to release, or no one would be released. [**Ex. 2**, Deposition of Jennifer Burbridge 52:1-16]. During her taking of the pregnancy test, a male corrections officer opened the cell door and looked in. [**Ex. 2**, Deposition of

20

Jennifer Burbridge 53:8-17]. Jennifer was never told the results of her pregnancy test. [**Ex. 2**, Deposition of Jennifer Burbridge 58:12-20].

## V. The S.L.M.P.D. sets forth departmental policy regarding the use of chemical munitions in its special orders.

Section XIII of St. Louis Metropolitan Police Department Special Order 1-01 relates to the deployment of chemical agents for crowd dispersal and was issued in response to a settlement agreement entered in the case styled *Alexis Templeton, et al., v. Sam Dotson, et al.*, Cause Number 4:14CV2019-CEJ, which was brought in the United States District Court for the Eastern District of Missouri. [**Defendants Exhibit N**]. Section XIII of S.O. 1-01 describes chemical agent equipment as including, but not limited to, inert smoke grenades; Oleoresin Capsicum (OC) and Chlorobenzalmalononitrile (CS) gas grenades; launched OC; launched CS; pepperballs; and high-capacity, extended range OC spray. The Special Order does not, however, define chemical agents. The *Templeton* settlement agreement defines a chemical agent as "tear gas, inert smoke, pepper gas, or other chemical agents. [**Ex. 28**].[9] The Special Order provides that "chemical agents will not be used for the

---

[9] The *Templeton* settlement [included as **Exhibit 28**] provides that defendant will not enforce any rule, policy, or practice that grants law enforcement officials the authority or discretion to use chemical agents for purposes of dispersing groups of individuals who are engaged in non-criminal activity without first: issuing clear and unambiguous warnings that such chemical agents will be utilized, providing sufficient opportunity to heed the warnings and exit the area, reasonably attempting to minimize the impact of such chemical agents on individuals who are complying with lawful law enforcement commands, and ensuring that there is a means of safe egress from the area that is available to the individuals and announcing this means of egress. These provisions do not apply "to situations that turn violent and persons at the scene present an imminent threat of bodily harm to persons or damage to property, and when law enforcement officials must defend themselves or other persons or property against such imminent threat. It also prevents the use of chemical

purpose of frightening or punishing individuals for exercising their constitutional

rights." It goes on to provide "Restrictions on Deployment" as follows:

> 2. Per a settlement agreement in U.S. District Court, chemical agents
> will not be used to disperse groups engaged in non-criminal activity
> without satisfying all of the following elements.
>
> a. The Incident Commander ensures that clear and unambiguous
> warnings are issued stating that chemical agents will be utilized, in
> conjunction with a statement about why the area is being cleared, (e.g.,
> "You are impeding the flow of vehicular traffic");
>
> b. Individuals are provided sufficient opportunity to heed the above
> mentioned warnings and exit the area;
>
> c. The impact of chemical agents on individuals who are complying
> with lawful law enforcement commands is minimized; and
>
> d. Ensuring and announcing a means of safe egress from the area that
> is available to individuals.
>
> 3. The above provisions do not apply to situations that turn violent
> when persons at the scene present an imminent threat of bodily harm
> to persons, or of damage to property, and when law enforcement
> officials must defend themselves or other persons or property against
> such imminent threats.

[**Ex. N**]. The Special Order requires that an I/LEADS report be created to document

the use of chemical agents to disperse a crowd. *Id.*

Section IV of Special Order 1-01 is entitled "Use of Non-Deadly Force –

Pepper Mace" and its stated purpose is to provide procedures relating to the use of

pepper spray. [**Exhibit N**]. It states that "pepper mace is provided for use when force

---

agents on individuals engaged in non-criminal activity for the purpose of frightening them or
punishing them for exercising their constitutional rights.

is necessary to control belligerent, uncooperative persons for whom verbal controls are ineffect." [*Id.*] Section IV provides as follows for the use of pepper mace:

> An officer may use pepper mace:
>
> a. to effect a lawful arrest, or to otherwise lawfully control a combative, uncooperative person, when verbal commands and persuasion have been ineffective in inducing cooperation; or
>
> b. to control a dangerous animal.
>
> 2. Pepper mace will not be used against a person who is being controlled by a neck restraint.
>
> 3. Since pepper mace can adversely affect persons in the immediate area of the person against whom it is used, an officer should make every effort to avoid unnecessarily exposing bystanders to pepper mace.

[*Id.*]. Section IV goes on to provide that "since pepper mace is a method of physical control, and may only be used to overcome resistance to an officer's lawful authority, any arrest in which pepper mace is used will be classified as 'Resisting Arrest.'" [*Id.*].

## VI.  The S.L.M.P.D., however routine, violates its own special orders.

As set forth above with references to the record, with respect to the Burbridges, both were subjected to indiscriminate spraying in contravention to policy; the direct macing of Drew Burbridge by Sgt. Rossomanno violated the policy; neither of the Burbridges were charged with or classified as "resisting arrest" in violation of policy; neither the applications of mace against Drew Burbridge or Jennifer Burbridge was reported by the officers in violation of policy; neither of the

Burbridges were allowed to clean the mace off of their face or provided any type of medical treatment.

At times, riot police have given pedestrians no warning at all before deploying chemicals indiscriminately or taking other actions of force. [**Ex. 29**, Ahmad Declaration; **Ex. 30**, Dreith Declaration; **Ex. 31** Smith Declaration; **Ex. 32**, Wedding Declaration.] At other times, the police have provided vague, haphazard instructions in some apparent facsimile of the City's "unlawful assembly" and "failure to disperse" ordinances. [**Ex. 33**, Southwards Declaration.] Even then, the warnings have been far away from the sites of the officers' eventual enforcement, based on constitutionally insufficient cause, and either followed immediately by the use of force (like knocking while opening a door) or too remote in time to justify their actions. [*Id.*; see also **Ex. 13**, Maclean Declaration.]

## VII.  Training of the named police officer defendants.

### a.  Sgt. Rossomanno

When Sgt. Rossomanno joined the civil disobedience team in 2006, there was "just more or less in-house training." [**Ex. 19,** Deposition of Sgt. Rossomanno 21:19-23]. Sgt. Rossomanno had never been sent to a national training conference or seminar on crowd control. [**Ex. 19**, Deposition of Sgt. Rossomanno 22:1-3]. The closest thing to organized training was traveling to Cleveland to observe how their department handled large crowd response. [**Ex. 19**, Deposition of Sgt. Rossomanno 22:7-25; 23:1-18].

24

With respect to the rank and file members of the Department, many civil disobedience team members were assigned to the CDT right out of the academy. [**Ex. 19**, Deposition of Sgt. Rossomanno 23:19-25; 24:1-2]. These officers would receive two-days of training, and then a refresher class at most every quarter. [*Id.*]. Sgt. Rossomanno believes there was a training session within a month of the *Stockley* protests, as the Department was expecting civil unrest. [**Ex. 19**, Deposition of Sgt. Rossomanno 29:21-25; 30:1-5]. However, the CDT members had not received any special training with respect to how to interact with the media. [**Ex. 19**, Deposition of Sgt. Rossomanno 36:1-15].

- **The actions of the police in deploying mace on September 17, 2017, violate their special orders on use of force.**

Sgt. Rossomanno testified that while he carried a fogger (sometimes referred to as a "bear fogger")[10], he did not receive any special training beyond what he would get for regular mace. [**Ex. 19**, Deposition of Sgt. Rossomanno 27:10-15; 43:17-24; 44:1-4]. Despite the fact that his use of mace was captured on film (and for purposes of this motion essentially conceded by the City), Sgt. Rossomanno never filed a use of force report pursuant to the written policy of the Department. [**Ex. 19**, Deposition of Sgt. Rossomanno 60:4-6]. Sgt. Rossomanno did not know that the Special Orders requires an arrested to be classified as "resisting arrest" anytime chemical weapons are used. [**Ex. 19**, Deposition of Sgt. Rossomanno 46:12-15].

---

[10] A fogger is a high capacity mace that shoots at a farther distance (**Ex. #**, Deposition of Sgt. Rossomanno 54:11-14)

### b.  P.O. Rachas

Officer Rachas testified that despite a highly anticipated verdict in the *Stockley* case he received no special preparation or training. [**Ex. 20**, Deposition of P.O. Rachas 22:16-24, 23:4-16]. When Officer Rachas was deployed downtown on September 17, 2017, he had received no intelligence brief, nor any type of special instruction from the Department regarding the police response to the verdict [**Ex. 20**, Deposition of P.O. Rachas 22; 20-24, 24:18-22]. Other than his general training, he has received no specialized training in chemical weapons or use of force [**Ex. 20**, Deposition of P.O. Rachas 25:4-9] nor has he received any training on large crowd response. [**Ex. 20**, Deposition of P.O. Rachas 25:10-12].

### c.  P.O. Burton

Officer Burton did not recall attending any briefings before the *Stockley* verdict or receiving any additional training. [**Ex. 24**, Deposition of P.O. Burton 16:23-25; 18:1-4].

### d.  P.O. Biggins

Officer Biggins' training in crowd control was limited to his initial training at the Police Academy and then one to two additional days a year. [**Ex. 34**, Deposition of P.O. Biggins 13:25; 14:1-3; 15:10-20]. This training had no additional training on use of force. [**Ex. 34**, Deposition of P.O. Biggins 17:3-5].

## VIII. Multiple examples of similar conduct by S.L.M.P.D. officers.

After the *Stockley* verdict, public protests began almost immediately and
continued every day. It is no secret that the St. Louis Metropolitan Police
Department has repeatedly engaged in heavy-handed conduct vis-à-vis the protests.
As soon as the afternoon of the verdict, police officers were—without warning or
justification—spraying nonviolent protestors with chemical agents. [See **Ex. 29**,
Ahmad Declaration; **Ex. 30**, Dreith Declaration; **Ex. 35** Dreith Testimony; **Ex. 31**,
Smith Declaration; **Ex. 32**, Wedding Declaration; **Ex. 36** Molina Testimony]. Since
then, S.L.M.P.D. officers have continued to deploy chemical agents, including pepper
pellets and tear gas, on multiple occasions without adequate justification and
without giving constitutionally required notice. [See, e.g., **Ex. 37**, Sommers
Declaration; **Ex. 38**, Green Declaration; **Ex. 8**, Rice Declaration; **Ex. 39**, Counihan
Declaration; **Ex. 15**, Lewczuk Declaration; **Ex. 40**, Hoffmann Declaration, **Ex. 6**,
Street Declaration, **Ex. 7**, Davis Declaration]. In fact, S.L.M.P.D. officers have
repeatedly sprayed and gassed nonviolent protestors who criticize the police or
record them engaging in intimidation. [See, e.g., **Ex. 9**, Ziegler Declaration; **Ex. 4**,
Rose Declaration; **Ex. 41** Rose Testimony; **Ex. 42** Kelly-Franks Testimony; **Ex. 37**,
Sommers Declaration; **Ex. 38**, Green Declaration; **Ex. 8**, Rice Declaration, **Ex. 6**,
Street Declaration; **Ex. 43** Wedding Testimony]. Officers have retaliated against
live-streamers and videographers by deleting video, conducting unlawful searches,
damaging video equipment, using unnecessary force when conducting arrests, and—
again—resorting to chemical agents, often at close range and in the eyes. [**Ex. 44**,

Mobley Declaration; **Ex. 9**, Ziegler Declaration; **Ex. 8**, Rice Declaration; **Ex. 37**, Sommers Declaration; **Ex. 45** Sommers Testimony **Ex. 46**, Thomas Declaration.]

## IX.  Other litigation stemming from the actions of the S.L.M.P.D. related to the *Stockley civil unrest.*

In addition to the lawsuit arising from the assault and civil rights deprivations visited upon the Burbridges, numerous others reported being assaulted and having their civil rights violated by the S.L.M.P.D., including an on-duty undercover police officer (see *Milton Green v. City of St. Louis, et al.,* Cause No. 4:19-cv-01563) (an undercover police officer viciously assaulted by his colleagues who did not recognize he was a police officer)).

The City is facing at least 25 civil rights law suits in this jurisdiction for their conduct during the *Stockley* civil unrest including those filed by the Burbridges, by Officer Green, by a U.S. Air Force officer and his wife, by a reporter, etc. See:

- *Ahmad, et al. v. City of St. Louis, et al.,* Cause No. 4:17 CV 2455
- *Rasheed Aldridge v. City of St. Louis, et al.,* Cause No. 4:18-CV-01677
- *Fareed Alston v. City of St. Louis, et al.,* Cause No.  4:18-CV-01569
- *Amir Brandy v. City of St. Louis, et al.,* Cause No. 4:18-CV-01674
- *Brian Baude v. City of St. Louis, et al.,* Cause No. 4:18-CV-01564
- *Crystal Brown v. City of St. Louis, et al.,* Cause No. 4:18-CV-01676
- *Emily Davis v. City of St. Louis, et al.,* Cause No. 4:18-CV-01574
- *Heather DeMian v. City of St. Louis, et al.,* Cause No. 4:18-CV-01680

- *Alison Dreith v. City of St. Louis, et al.,* Cause No. 4:18-CV-01565

- *Michael Faulk v. City of St. Louis, et al.,* Cause No. 4:18-CV-00308

- *Darryl Gray v. City of St. Louis, et al.,* Cause No. 4:18-CV-01678

- *Megan Ellyia Green v. City of St. Louis, et al.,* Cause No. 4:18-CV-01629

- *Mark Gullet v. City of St. Louis, et al.,* Cause No. 4:18-CV-01571

- *Calvin Kennedy v. City of St. Louis, et al.,* Cause No. 4:18-CV-01679

- *Lindsey Laird and Andre Roberts v. City of St. Louis, et al.,* Cause No. 4:18-CV-01567

- *Derek Laney v. City of St. Louis, et al.,* Cause No. 4:18-CV-01575

- *Alex Nelson and Iris Nelson v. City of St. Louis, et al.,* Cause No. 4:18-CV-01561

- *Dillan Newbold v. City of St. Louis, et al.,* Cause No. 4:18-CV-01572

- *Mario Ortega v. City of St. Louis, et al.,* Cause No. 4:18-CV-01576

- *Christopher Robertson v. City of St. Louis, et al.,* Cause No. 4:18-CV-01570

- *Keith Rose v. City of St. Louis, et al.,* Cause No. 4:18-CV-01568

- *Demetrius Thomas v. City of St. Louis, et al.,* Cause No.  4:18-CV-01566

- *Jonathan Ziegler v. City of St. Louis, et al.,* Cause No. 4:18-CV-00308

The litigation stemming out of the *Stockley* civil unrest is not limited to the civil arena either, as at least four St. Louis Metropolitan Police Department officers having been charged with crimes related to the assault of Officer Green: see *United States of America v. Dustin Boone, Randy Hays, Christopher Myers, and Bailey*

29

*Colletta*, Cause No. 4:18-CR-00975.[11] One of these officers, Bailey Colletta, pleaded guilty on September 6, 2019,

## X.  The S.L.M.P.D. response on September 17, 2017, is similar to other responses the Department has had and chills free speech.

The *Stockley* protests are not S.L.M.P.D.'s first experience with First Amendment violations. The St. Louis Metropolitan Police Department has reacted in much the same way on other occasions when St. Louisans have amassed in public places to demonstrate against what they see as police misconduct; that is, with the arbitrary enforcement of vague ordinances and the deployment of chemical agents without adequate cause or warning. [See, e.g., **Ex. 29**, Ahmad Declaration; **Ex. 40**, Hoffmann Declaration; **Ex. 14**, Molina Declaration.]

S.L.M.P.D.'s unconstitutional policies and customs have frightened Plaintiffs and chilled their observation of, recording of, and participating in protesting activity. They have refrained from expressive activity they otherwise would have engaged in. [See **Ex. 29**, Ahmad Declaration; **Ex. 30**, Dreith Declaration; **Ex. 44**, Mobley Declaration; **Ex. 13**, Maclean Declaration.]

---

[11] Text messages between these officers, as set forth in the indictment, reveal a terrifying culture of physical violence and disregard for the Constitutional rights of the citizenry. See *U.S. v. Boone, et al.,* Cause No. 4:18-CR-00975 (Doc. 2, ¶10): "let's whoop some ass", "it's gonna be a lot of fun beating the hell out of these shitheads once the sun goes down and nobody can tell us apart", "it's still a blast beating people that deserve it", "we start beating the shit out of everyone on the street after we give two warnings…", etc.

## DISCUSSION

Applying the facts of the case to the law demonstrate that there are sufficient factual disputes and legal support for this matter to proceed to trial by jury as pleaded in the Third Amended Complaint (Doc. 70).

### A.  Standard of Review for Summary Judgment

Under Rule 56 of the Federal Rules of Civil Procedure, a movant is entitled to summary judgment if he can "show that there is no genuine issue as to any material fact and that he is entitled to a judgment as a matter of law." Fed.R.Civ.P. 56(c); *First Security Savings v. Kansas Bankers Surety Co.*, 849 F.2d 345, 349 (8th Cir. 1988); *Agristor Leasing v. Farrow*, 826 F.2d 732, 734 (8th Cir. 1987).  A court is required to view the facts and inferences that reasonably may be derived therefrom in the light most favorable to the nonmoving party.  *Holloway v. Lockhart*, 813 F.2d 874, 876 (8th Cir. 1987); *Economy Housing Co. v. Continental Forest Products, Inc.*, 757 F.2d 200, 203 (8th Cir. 1985).  The burden of proof is on the moving party, and a court should not grant a summary judgment motion unless it is convinced that there is no evidence to sustain a recovery under any circumstances.  *Foster v. Johns-Manville Sales Corp.*, 787 F.2d 390, 392 (8th Cir. 1986).

### B.  Fourth Amendment Violations: unlawful search and seizure and excessive force (Count III).

Count III of the Third Amended Complaint alleges the Plaintiffs' Fourth Amended rights were violated. Specifically, the Plaintiffs had a right to be free from

illegal search and seizure, and free from the use of excessive force by law
enforcement. These rights were violated when the Burbridges were kettled and
denied egress from the street corner, when they were detained against their will on
the ground, when they were indiscriminately maced by police, when Drew was
assaulted and directly maced, when they were arrested, when they were jailed, and
when Jennifer was forced to submit to a pregnancy test against her will. All of this
occurred despite the consensus that the Burbridges were not acting violently, were
not engaged in any property destruction, and had not actively resisted arrest. The
actions of the police were punitive and violated their Fourth Amendment rights.

A person is seized for Fourth Amendment purposes when an officer by means
of physical force "terminates or restrains his freedom of movement through means
intentionally applied." *Brendlin v. California*, 551 U.S. 249, 254 (2007). The right to
be free from excessive force in the context of an arrest is clearly established under
the Fourth Amendment. *Henderson v. Munn*, 439 F.3d 497, 503 (8th Cir. 2006).
"The test is whether the amount of force used was objectively reasonable under the
particular circumstances." *Brown v. City of Golden Valley*, 574 F.3d 491, 496 (8th
Cir. 2009). Relevant circumstances include "the severity of the crime at issue,
whether the suspect poses an immediate threat to the safety of the officer or others,
and whether [they] are actively resisting arrest or attempting to evade arrest by
flight." *Graham v. Connor*, 490 U.S. 386, 396 (1989).

"The reasonableness of a particular use of force must be judged from the
perspective of a reasonable officer on the scene, rather than with the 20/20 vision of

hindsight. Not every push or shove, even if it may later seem unnecessary in the peace of a judge's chambers violates the Fourth Amendment." *Id.* (internal quotation marks and citation omitted). "The calculus of reasonableness must embody allowance for the fact that police officers are often forced to make split-second judgments in circumstances that are tense, uncertain, and rapidly evolving about the amount of force that is necessary in a particular situation." *Id.* at 396-97. "[F]orce is least justified against nonviolent misdemeanants who do not flee or actively resist arrest and pose little or no threat to the security of the officers or the public." *Brown*, 574 F.3d at 499. "The use of any force by officers simply because a suspect is argumentative, contentious, or vituperative is not to be condoned." *Bauer v. Norris*, 713 F.2d 408, 412 (8th Cir. 1983). "[T]he use of . . . gratuitous force against a suspect who is handcuffed, not resisting, and fully subdued is objectively unreasonable under the Fourth Amendment." *Krout v. Goemmer*, 583 F.3d 557, 566 (8th Cir. 2009).

The plaintiffs have both testified that they were attempting to leave the area of Washington and Tucker, but were denied egress and kettled, and then subsequently subjected to the indirect application of chemical munitions. Both Drew and Jennifer Burbridge denied hearing warnings to either not enter the area, or to disperse. Both of the Burbridges were subjected to environmental mace indiscriminately applied to the crowd. Drew Burbridge was then pulled away from his wife, brought to the ground, had an officer put his knee on his neck, maced twice by Sgt. Rossomanno, and assaulted by Officers Rachas and Burton. The question of

whether Sgt. Rossomanno and Officers Rachas, Burton and Biggins use of force against Drew Burbridge was reasonable under the circumstances is one of fact for a jury. Drew Burbridge has presented sufficient evidence that there was no legal justification to support his arrest or the use of force during his arrest. The application of mace / pepper spray by Sgt. Rossamanno was gratuitous and completely without legal justification – it was an assault.

Additionally, the persons of the Plaintiffs were seized within the meaning of the Fourth Amendment (through denying their egress from the kettling, and then for arresting and jailing them without sufficient legal justification). Most egregiously, the person of Jennifer Burbridge was seized when she was subjected to a pregnancy test against her will, made as a condition of release from incarceration (as alleged in the ¶108 of the Third Amended Complaint (Doc. 70).

i.    *Monell* liability in general and a pattern and practice of Fourth Amendment violations exists which create *Monell* liability for the City.

The City seeks to be excused from the actions of its officers claiming that there was no pattern and practice of civil rights violations (excessive force, violations of Fourth Amendment rights, etc.) The events of September 17, 2017, alone (which resulted in twenty-plus separate lawsuits) show a pattern and practice by the City. Additional past actions of the Department further support a pattern and practice that attaches *Monell* liability to the City for the actions of its officers.

Pursuant to the municipal custom theory, a local governmental body may be held liable under Section 1983 where "the action that is alleged to be

34

unconstitutional implements or executes a policy statement, ordinance, regulation, or decision officially adopted and promulgated by that body's officers." See *Monell v. New York City Dep't of Soc. Servs.*, 436 U.S. 658, 690, (1978). In *Monell* the United States Supreme Court held that municipalities may be liable for the acts of their employees under §1983 where "the action that is alleged to be unconstitutional implements or executes a policy statement, ordinance, regulation, or decision officially adopted and promulgated" by the municipality. *Id* at 690. To establish liability for a custom, plaintiff must show that there is: (1) a continuing, widespread, and persistent pattern of unconstitutional misconduct, (2) deliberate indifference or tacit authorization of such conduct by policymaking officials after notice of the conduct, and (3) that the custom caused the violation of plaintiff's constitutional rights. See *Johnson v. Douglas Cnty. Med. Dept.*, 725 F.3d 825, 828 (8th Cir.2013); *Abdullah v. County of St. Louis, Mo.*, 52 F. Supp. 3d 936, 944 (E.D. Mo. 2014); see also *Johnson v Bd. of Police Comm'rs, 351 F. Supp. 2d 929* at 947 (E.D. Mo 2004), quoting *Kuha v. City of Minnetonka*, 365 F.3d 590, 604 (8th Cir. 2003).

The governmental custom need not "receive[ ] formal approval through the body's official decision making channels," *Id.* at 691, and may refer to unwritten understandings "intended to ... establish fixed plans of action to be followed under similar circumstances consistently and over time," See *Pembaur v. City of Cincinnati*, 475 U.S. 469, 480-81 (1986).

There is evidence before this Court that the S.L.M.P.D. has similarly used chemical agents against protestors in the past, both in the days preceding

September 17, 2017 and in multiple incidents on September 17, 2017. The sheer number of complaints and lawsuits resulting from the City's conduct during the *Stockley* unrest evidence a pattern and practice of civil rights violations. As discussed above in the Plaintiffs' statement of fact, the following represent a non-exclusive list of individuals who were maced by police during the *Stockley* unrest, despite being non-violent: Alison Dreith, Derrell Smith, Keith Rose, Dana Kelly-Franks, Joshua Wedding, Sarah Molina, Steven Hoffmann, and Chris Sommers. The police treatment of the Burbridges was not an isolated event. It was part of a pattern and practice by the S.L.M.P.D. of mis-using chemical weapons.

The Burbridge have testified that they did not hear warnings to disperse, and that the group was behaving peacefully. There was no Constitutional or legal basis to disperse the crowd or order the mass arrests and use of force.

Judge Perry (U.S.D.C., E.D. Mo.) has already made a preliminary finding that such a pattern and practice of misconduct within the S.L.M.P.D. actually exists, through the equity proceedings held in *Ahmad, et al. v. City of St. Louis, et al.,* Cause No. 4:17 CV 2455 CDP (U.S.D.C., E.D. Mo.).[12] [**Exhibit 47**]. After hearing the testimony of 21 witnesses, and receiving numerous exhibits into evidence, the Court on November 15, 2017, entered a preliminary injunction against the City. In *Ahmad*, Judge Perry found that "Plaintiffs have also presented sufficient evidence

---

[12] A preliminary injunction was issued by Judge Perry on November 15, 2017 (Doc. 57) and was not appealed by the City. On March 29, 2019, the City filed a motion to reconsider the preliminary injunction (Doc. 126) which was denied by the Court (Doc. 159) who held that "the motion [for reconsideration] amounts to nothing more than an attempt to reargue the [original motion] with new counsel and more strident rhetoric" and that the "evidence submitted by [the City] only demonstrates that the facts are contested". (See Doc. 159).

demonstrating that they are likely to prevail on their claim that defendant has a custom or policy of using chemical agents without warning on citizens engaged in expressive activity that is critical of police or who are recording police in retaliation for the exercise of their first amendment rights, in violation of the First, Fourth, and Fourteenth Amendments."

In the *Ahmad* case, Lt. Timothy Sachs (the commander in charge of the Civil Disobedience Team) and other officers testified that Section XIII of Special Order 1-01 relating to the deployment of chemical munitions for crowd dispersal does not apply to the use of hand held mace. [**Ex. 18**]. The order, however, does not specifically exempt hand held mace from within its purview, nor does the settlement agreement reached in *Templeton*. As the Court summarized "pepper spray is a 'chemical agent,' no matter its method of deployment." *Id.,* Doc. 57 at p.42. In the incidents of September 14, 15 and 17, 2017, the *Ahmad* Court found sufficient, credible testimony and video evidence from numerous witnesses that they were maced without warning in the absence of exigent circumstances while they were not engaging in violent activity and either were not in defiance of police commands (because none were given) or were complying with those commands. The evidence showed that police used hand held mace without warnings regularly in situations where Section XIII of Special Order 1-01 and the *Templeton* settlement agreement require warnings. Neither the Special Order nor *Templeton* are limited to situations in which an unlawful assembly is first declared. Plaintiffs also introduced sufficient, credible evidence of people being maced while simply recording police activity and/or

37

voicing criticism of officers and for no readily apparent, legitimate law enforcement purpose, contrary to the official written policy regarding recording set out in Special Order 1-06.

As in *Ahmad*, plaintiffs evidence, both video and testimonial, showed that officers exercised their discretion in an arbitrary and retaliatory fashion to punish people for voicing criticism of police or recording police conduct. The S.L.M.P.D. has a custom or policy of deploying hand held pepper spray against citizens engaged in recording police or in expressive activity critical of police in retaliation for the exercise of their first amendment rights, in violation of the First, Fourth, and Fourteenth Amendments.

ii.     **The Officers are not entitled to qualified immunity for their actions.**

The Defendants try to escape liability for excessive force under §1983 by claiming their actions with respect to the detention, assault, and arrest of Drew and Jennifer are protected by the doctrine of qualified immunity.

Police officers are entitled to qualified immunity unless (1) the evidence, viewed in the light most favorable to the plaintiffs, establishes a violation of a constitutional or statutory right, and (2) the right was clearly established at the time of the violation, such that a reasonable official would have known that his actions were unlawful. See *Blazek v. City of Iowa City*, 761 F.3d 920, 922-23 (8th Cir. 2014). Factors to be considered in determining the reasonable use of excessive force include whether there was an objective need for force, the relationship between the need and the amount of force used, the threat reasonably perceived by the

officers, efforts the officers used to temper the severity of their response, and the extent of the incarcerated person's injury. *Treats v. Morgan*, 308 F.3d 868, 872 (8th Cir. 2002).

Although not every push or shove violates the Fourth Amendment, *Guite v. Wright*, 147 F.3d 747, 750 (8th Cir. 1998), the use of gratuitous force against a helpless individual is unreasonable. See, e.g., *Phelps v. Coy*, 286 F.3d 295, 301 (6th Cir. 2002) (noting "on the facts as we must take them, there was simply no governmental interest in continuing to beat [the plaintiff] after he had been neutralized, nor could a reasonable officer have thought there was"); *Fontana v. Haskin*, 262 F.3d 871, 880 (9th Cir. 2001)(stating "gratuitous and completely unnecessary acts of violence by the police during a seizure violate the Fourth Amendment."); *Miller v. Smith*, 220 F.3d 491, 495 (7th Cir. 2000) (finding allegations that officers smacked suspect around while he lay cuffed on the ground violate the Fourth Amendment); *Palmer v. Sanderson*, 9 F.3d 1433 (9th Cir.1993) (noting that jerking, pushing, and tightly handcuffing a 67-year-old man amounts to excessive force); *Adams v. Metiva*, 31 F.3d 375, 387 (6th Cir.1994) (stating use of force after suspect was incapacitated by mace would amount to excessive force as a matter of law). "There is no uniform requirement that a plaintiff show more than de minimis injury to establish an application of excessive force." *Chambers v. Pennycook*, 641 F.3d 898, 907 (8th Cir. 2011).  Further, any dispute of a "factual claims regarding the amount and degree of force used … establishes a genuine issue of material fact for trial precluding summary judgment [on the] claim of qualified

immunity with respect to the…claim of excessive force." *Lambert v. City of Dumas*, 187 F.3d 931, 933–34 (8th Cir.1999) (rejecting qualified immunity where officers shoved and kicked a non-resisting suspect).

Drew Burbridge was unarmed. He was following police commands to sit on the ground. He was not actively resisting the police officers or using any force. Drew Burbridge did not threaten the police officers. As the video shows, Drew Burbridge was prone and under the control of three police officers when Sgt. Rossomanno walked up and maced him. He had an officer kneeling on his neck without cause and was then punched and kicked by officers when he was clearly already under control and not resisting. The failure of these officers to report their use of force evidences a consciousness of guilt; they knew their force was not justifiable. At the very least, it is a question of fact for the jury whether the application of mace in this circumstance was warranted.

Police also intentionally maced Jennifer Burbridge while she was peacefully sitting on the ground, fully compliant with police instructions and direction. She was then seized, jailed, and invasively pregnancy tested against her will.

In this case there is no question that the plaintiffs had a constitutional right to be free from assault and mace without legal justification. Nor can there be any dispute that these rights were not clearly established on September 17, 2017, and a reasonable police officer would have known that they cannot mace, and arrest citizens for gathering and filming the police. The unconstitutionality of the use of

gratuitous force against a suspect after he was subdued has been well-established at least by 1991. *Adams v. Metiva*, 31 F.3d at 387 (6th Cir. 1994).

### C.        Failure to Train (Count IX)

The above described exercises of excessive force, false arrest, and illegal search and seizure are a direct result of the City of St. Louis and the St. Louis Metropolitan Police Department failing to train its officers.

To state a claim under §1983 for failure to train or supervise, Plaintiff must plead facts sufficient to demonstrate that, (1) the City's police officer training and supervision practices were inadequate; (2) the City was deliberately indifferent to the rights of others in adopting these practices, such that the City's failure to train and supervise was a result of deliberate or conscious choices; and (3) the City's training and supervision deficiencies caused Plaintiff's constitutional deprivation. See, *Ulrich v. Pope Cty.*, 715 F.3d 1054, 1061 (8th Cir. 2013)(citation omitted).

"For liability to attach, [plaintiffs] must show, the need for more or different training is so obvious, and the inadequacy so likely to result in the violation of constitutional rights, that [the defendant] reasonably be said to been deliberately indifferent to the need." *Ambrose v. Young*, 474 F.3d 1070, 1079 (8th Cir.2007), quoting, *City of Canton, Ohio v. Harris*, 489 U.S. 378, 389 (1989). "It is necessary to show that in light of the duties assigned to specific officers or employees the need for more or different training is so obvious, and the inadequacy so likely to result in the violation of constitutional rights, that the policymakers of the city can reasonably be said to have been deliberately indifferent to the need. In other words, the plaintiff

41

must demonstrate that the city had notice that its procedures were inadequate and likely to result in a violation of constitutional rights. *Andrews v. Fowler*, 98 F.3d 1069, 1076 (8th Cir.1996). "[A] single violation of constitutional rights could trigger municipal liability, where the violation is accompanied by a showing that the municipality had 'failed to train its employees to handle recurring situations presenting an obvious potential for such a violation.'" *Szabla v. City of Brooklyn Park*, 486 F.3d 385, 393 (8th Cir.2007)

Here what seems the most striking is the failure to adopt training to address evidence of past constitutional violations in situations that are clearly going to re-occur.  In *Holscher v. Mille Lacs Cnty*, 924 F.Supp.2d 1044, 1057 (D. Minn. 2013), the court pointed out that an entity can be liable for failure to revise training in light of obvious deficiencies.  There, despite having a valid policy to avoid jail suicides, several past suicides show that the written policy wasn't followed, and thus, "a jury could infer that the County's training was inadequate; the County was deliberately indifferent in failing to revise its training; and this inadequate training caused Plaintiffs' injury."  Id.

In this matter the City has had numerous incidents of civil unrest leading up to the September 17, 2017, arrest of the Burbridges. There is no evidence that the S.L.M.P.D. provided these officers with the training they needed to respond to these highly anticipated civil gatherings and incidents of unrest. The injuries visited upon the Burbridges were a direct result of this institutional failure to train.

42

**D. Freedom of Speech and First Amendment Retaliation (Counts I & II)**

Drew and Jennifer Burbridge were present on September 17, 2017, in the role of documentary film makers and journalists. They were exercising their First Amendment rights to freely assemble and to document a free and public assembly. There is evidence before this Court that they were targeted by the police for their documentary efforts, singled out by law enforcement, and then assaulted and detained because they were taking pictures and video-taping the police and the police crowd response.

The First Amendment declares that States "shall make no law ... abridging the freedom of speech ... or the right of the people peaceably to assemble." U.S.Const. amend. I. "[T]he First Amendment reflects a 'profound national commitment' to the principle that 'debate on public issues should be uninhibited, robust, and wide-open ” *Boos v. Barry*, 485 U.S. 312, 318 (1988) (quoting *New York Times Co. v. Sullivan*, 376 U.S. 254, 270 (1964)). Plaintiffs are engaging in speech in a traditional public forum. See *United States v. Grace*, 461 U.S. 171, 177 (1983) (streets, sidewalks, and parks are public places historically associated with the free exercise of expressive activities and considered, without more, to be public forums). "In such places, the government's ability to permissibly restrict expressive conduct is very limited: the government may enforce reasonable time, place, and manner regulations as long as the restrictions are content-neutral, are narrowly tailored to serve a significant government interest, and leave open ample alternative channels of communication". *Id.* (internal quotation marks and citations omitted).

"The very idea of government, republican in form, implies a right on the part of its citizens to meet peaceably for consultation in respect to public affairs and to petition for the redress of grievances." *De Jonge v. Oregon*, 299 U.S. 353, 364 (1937) (internal quotation marks and citation omitted). "The right of peaceable assembly is a right cognate to those of free speech and free press and is equally fundamental." *Id.*

> The greater the importance of safeguarding the community from incitements to the overthrow of our institutions by force and violence, the more imperative is the need to preserve inviolate the constitutional rights of free speech, free press and free assembly in order to maintain the opportunity for free political discussion, to the end that government may be responsive to the will of the people and that changes, if desired, may be obtained by peaceful means. Therein lies the security of the Republic, the very foundation of constitutional government.

*Id.* at 365 (internal quotation marks and citation omitted). "It follows from these considerations that, consistently with the Federal Constitution, peaceable assembly for lawful discussion cannot be made a crime." *Id.* "The right to associate does not lose all constitutional protection merely because some members of the group may have participated in conduct or advocated doctrine that itself is not protected." *NAACP v. Claiborne Hardware Co.*, 458 U.S. 886, 908 (1982).

Numerous federal circuit courts of appeals have recognized a general First Amendment right to record police performing their duties in public, subject to certain limitations. See, e.g., *Am. Civil Liberties Union of Illinois v. Alvarez*, 679 F.3d 583, 595 96 (7th Cir. 2012); *Glik v. Cunniffe*, 655 F.3d 78, 82 (1st Cir. 2011); *Smith v. City of Cumming*, 212 F.3d 1332, 1333 (11th Cir. 2000); see also, *Hoyland v. McMenomy*, 185 F. Supp. 3d 1111, 1124 (D. Minn. 2016), aff'd, 869

44

F.3d 644 (8th Cir. 2017). There is no question that the Burbridges' act of recording

the protests and police was not protected First Amendment activity.

      "The First Amendment prohibits government officials from subjecting an

individual to retaliatory actions…for speaking out." *Hartman v. Moore*, 547 U.S.

250, 256 (2006). "The First Amendment protects a significant amount of verbal

criticism and challenge directed at police officers." *Hoyland v. McMenomy*, 869 F.3d

644, 655 (8th Cir. 2017) (internal quotation marks and citation omitted). "Criticism

of public officials lies at the very core of speech protected by the First Amendment."

*Naucke v. City of Park Hills*, 284 F.3d 923, 927 (8th Cir. 2002)(internal quotation

marks and citation omitted). "The freedom of individuals verbally to oppose or

challenge police action without thereby risking arrest is one of the principal

characteristics by which we distinguish a free nation from a police state." *City of*

*Houston, Tex. v. Hill*, 482 U.S. 451, 462-63 (1987).

      To sustain a First Amendment retaliation claim, plaintiffs must show that

they engaged in protected activity, the police officers acted in a way that would chill

a person of ordinary firmness in continuing the protected activity, and the officer's

actions were motivated at least in party by plaintiffs' engaging in protected activity.

*Peterson v. Kopp*, 754 F.3d 594, 602 (8th Cir. 2014). Pepper spraying someone in the

face would chill a person of ordinary firmness. *Id.* In claims of retaliatory arrest,

plaintiffs must also show that the officer lacked at least arguable probable cause to

arrest plaintiffs. Id.

45

"It is well-settled law that a loss of First Amendment freedoms, for even minimal periods of time, unquestionably constitutes irreparable injury" and "it is always in the public interest to protect constitutional rights." *Phelps-Roper v. Nixon*, 545 F.3d 685, 691 (8th Cir. 2008)(internal quotation marks and citations omitted), overruled on other grounds, *Phelps-Roper v. City of Manchester, Mo.*, 697 F.3d 678 (2012).

As discussed above, it was not just the Burbridges who were retaliated against for First Amendment activity; others at the *Stockley* unrest were as well including Joshua Wedding, Steven Hoffmann, and Chris Sommers. There was no probable cause for the arrest of the Burbridges. The arrest of the Burbridges was done in retaliation for their filming and documenting police (as demonstrated by the quoted statements by police to both Drew and Jennifer).

### E.  Procedural due process (Count IV)

Count IV of Plaintiffs' Third Amended Complaint alleges that it is the Defendant City's custom and policy to enforce its ordinances regarding unlawful assemblies and dispersal orders in a manner which violates the Due Process Clause of the Fourteenth Amendment. Plaintiffs contend that the ordinances are unconstitutional on their face and as applied by defendant and that the City's enforcement of these ordinances, as applied to them on September 17, 2017, violated their constitutional due process rights. Defendant City alleges these ordinances are valid and constitutional.

"A fundamental principle in our legal system is that laws which regulate persons or entities must give fair notice of conduct that is forbidden or required." *FCC v. Fox Television Stations, Inc.*, 567 U.S. 239, 253 (2012). "A statute or ordinance violates the Due Process Clause if it fails to give fair warning that the allegedly violative conduct was prohibited." *Stahl v. City of St. Louis, Mo.*, 687 F.3d 1038, 1040 (2012). "Such a law offends due process because it may fail to provide the kind of notice that will enable ordinary people to understand what conduct it prohibits." *Id. (*quoting *City of Chicago v. Morales,* 527 U.S. 41, 56 (1999) (plurality opinion)(citing *Kolender v. Lawson,* 461 U.S. 352, 357 (1983*)). A vague law impermissibly delegates basic policy matters to policemen, judges, and juries for resolution on an *ad hoc* and subjective basis, with the attendant dangers of arbitrary and discriminatory application. *Grayned v. City of Rockford*, 408 U.S. 104, 108-09 (1972).

The Due Process Clause's proscription against vague regulations is stronger when the regulation in question implicates the First Amendment. "When speech is involved, rigorous adherence to those requirements is necessary to ensure that ambiguity does not chill protected speech." *Fox Television Stations, Inc.*, 567 U.S. at 253-54. That is so because "[s]peech is an activity particularly susceptible to being chilled, and regulations that do not provide citizens with fair notice of what constitutes a violation disproportionately hurt those who espouse unpopular or controversial beliefs." *Stahl*, 687 F.3d at 1041. "Uncertain meanings inevitably lead citizens to steer far wider of the lawful zone than if the boundaries of the forbidden

areas were clearly marked." *Grayned*, 408 U.S. at 109. An ordinance which accords to police "the full discretion…to determine" whether a violation has occurred "entrusts lawmaking to the moment-to-moment judgment of the policeman on his beat…furnishes a convenient tool for harsh and discriminatory enforcement by prosecuting officials against particular groups deemed to merit their displeasure… and confers on police a virtually unrestrained power to arrest and charge persons with a violation." *Kolender*, 461 U.S. at 357-58.

Sachs admitted that defendant has issued no guidelines with respect to when, how, or who should declare an unlawful assembly with respect to protest activity. All officers testified that it was within their sole discretion to declare an unlawful assembly whenever they observed a group violating any law, whether peaceably or not, including but not limited to merely congregating on sidewalks or on streets closed by police for protest activity. While unlawful assemblies were declared at times in response to violent activity by protesters (for example, at the mayor's house on the evening of September 15, 2017), they were also declared at other times when it was not "reasonable for rational, firm and courageous persons in the neighborhood of the assembly to believe the assembly will cause injury to persons or damage to property and will interfere with the rights of others by committing disorderly acts." *Mast*, 713 S.W.2d at 603-04, such as on September 17, 2017, and October 3, 2017.

The evidence shows there was no credible threat of force or violence to the officers or property (after 8:30pm) at the intersection of Washington and Tucker on September 17, 2017. The scene was calm. Sachs declared an unlawful assembly

because he did not want to allow people back into downtown. That is not lawful. There is a policy and custom of S.L.M.P.D. declaring unlawful assemblies in the absence of any threat of force or violent activity, with insufficient notice to citizens regarding what conduct is "unlawful". The actions of the defendants leads to arbitrary enforcement of the ordinance and curtails First Amendment rights of the citizenry.

### F.  Conspiracy to deprive civil rights (Count XI)

Plaintiffs have alleged in Count XI of their Third Amended Complaint that the individual officers have acted in concert and conspired to deprive them of their civil rights. Specifically, the officers targeted Drew and Jennifer for the documentation efforts, assaulted Drew in concert, and then willfully failed to report the assault in an attempt to obscure their roles.

To prove a 42 U.S.C. § 1983 conspiracy claim, a plaintiff must show: (1) that the defendant conspired with others to deprive him of constitutional rights; (2) that at least one of the alleged co-conspirators engaged in an overt act in furtherance of the conspiracy; and (3) that the overt act injured the plaintiff." *White v. McKinley*, 519 F.3d 806, 814 (8th Cir. 2008) (citation omitted). "The plaintiff is additionally required to prove a deprivation of a constitutional right or privilege in order to prevail on a § 1983 civil conspiracy claim." *Id.* (citation omitted). "A civil conspiracy claim requires the plaintiffs to allege sufficient "specific facts" giving rise to an inference of a meeting of the minds between the defendants to violate the plaintiff's constitutional rights. *Murray v. Lene*, 595 F.3d 868, 870 (8th Cir. 2010).

The officers seek to escape liability by arguing that (i) the claim is barred by the intracorporate conspiracy doctrine; (ii) there is no evidence to demonstrate an agreement between the officers; and (iii) there is no underlying constitutional claim.

### i.  The intracorporate conspiracy doctrine does not apply in this instance.

The City's argument that Plaintiffs' § 1983 conspiracy claim must be dismissed under the intracorporate conspiracy doctrine is unpersuasive. The doctrine, which the Eighth Circuit has seemingly only applied to conspiracy claims under 42 U.S.C. § 1985, provides that "a local government entity cannot conspire with itself through its agents acting within the scope of their employment." *Kelly*, 813 F.3d at 1078 (quoting *L.L. Nelson Enters., Inc. v. County of St. Louis, Mo.*, 673 F.3d 799, 812 (8th Cir. 2012)).

While, on information and belief, the Eighth Circuit has not addressed whether the doctrine applies to § 1983 conspiracy claims, Judge Noce of the Eastern District of Missouri observed in *Golden v. McMurtry* some other district courts have affirmatively held the doctrine does not apply to § 1983 conspiracies to commit excessive force:

> "Some courts have held that the intracorporate conspiracy doctrine does not protect conspiracies to commit excessive force under Section 1983. See, e.g., *McDorman v. Smith*, 2005 U.S. Dist. LEXIS 15964, 2005 WL 1869683, at *6 (N.D. Ill. Aug. 2, 2005). Those courts have reasoned that "the intracorporate conspiracy doctrine was created to shield corporations and their employees from conspiracy liability for routine, collaborative business decisions that are later alleged to be discriminatory," *Newsome v. James*, 2000 U.S. Dist. LEXIS 5678, 2000 WL 528475, at *15 (N.D. Ill. Apr. 26, 2000), and "police misconduct ... does not fit that mold because conspiracy and cover-up are not the product of routine police department decision-making." *McDorman*,

2005 U.S. Dist. LEXIS 15964, 2005 WL 1869683 at *6; see also *Howard v. City of Chicago*, 2004 U.S. Dist. LEXIS 21537, 2004 WL 2397281 at *12 (N.D. Ill. Oct. 25, 2004).

*Golden*, 2018 U.S. Dist. LEXIS 62828, 2018 WL 1784395, at *4. With no legal support in favor of the defendants, this argument should be disregarded.

Unconstitutional arrests, assaults, and cover-ups, such as occurred here, are not the product of routine police department decision making and the City should not be allowed to avail itself of this defense.

ii.   **There is sufficient evidence from which a jury could determine the officers conspired with one another.**

Drew was assaulted by four officers: Rachas, Burton, Biggins, and Rossomanno, who acted in concert to single him out from the crowd for his taking of photographs, bring him to the ground and assault him. None of the officers filed a "use of force" report, or is willing to admit they saw Sgt. Rossomanno mace Drew. Jennifer was likewise targeted for taking photographs and singled out. Defendants have failed or refused to identify the John Doe officer who assaulted Jennifer. This is sufficient for a jury to conclude that the officers were in fact conspiring with one another to violate the Burbridges' constitutional rights.

iii.   **There is an underlying constitutional claim.**

As discussed repeatedly above, Plaintiffs have shown constitutional claims related to the exercise of their First Amendment rights, and various violations of

51

their Fourth Amendment rights against excessive force and illegal search and
seizure.

### G.  State law claims must survive (Counts V, VI, VII, VIII and X)

Defendants seek to escape liability on the state law claims as well. With
respect to the assault and battery, the defendants seek official immunity. With
respect to the false arrest claims, the defendants state the arrests were lawful and
therefore no false imprisonment or malicious prosecution claim can lie.

### i.      The officers are not entitled to official immunity.

"Under Missouri law, the official immunity doctrine protects public officials
from liability for injuries arising out of their discretionary acts or omissions, but not
from liability in claims arising from their performance of ministerial acts."
*Reasonover v. St. Louis City.*, Mo., 447 F.3d 569, 585 (8th Cir. 2006)(citation
omitted). This Circuit has determined that "a police officer's decision to use force in
the performance of his duties is discretionary rather than ministerial." *Davis v.
White*, 794 F.3d 1008, 1013 (8th Cir. 2015)(citation omitted).

Additionally, "official immunity does not apply to discretionary acts done in
bad faith or with malice." *Id.* "Acting with malice requires an actual intent to cause
injury." *Wealot v. Brooks*, 865 F.3d 1119, 1129 (8th Cir. 2017)(citing *State ex rel.
Twiehaus v. Adolf*, 706 S.W.2d 443,447 (Mo. 1986)). "A finding of bad faith embraces
more than bad judgement or negligence. It imports a dishonest purpose, moral

obliquity, conscious wrongdoing, or breach of a known duty through ulterior motive."
*Id.*

Plaintiff has alleged and established facts from which it could be reasonably inferred that Defendants Rossomanno, Rachas, Burton, and Biggins acted in bad faith or with malice through the use of pepper spray without warning of the Plaintiff who was allegedly not engaged in unlawful activity, and then by assaulting him when he was under their control.. See *Aldridge*, 2019 U.S. Dist. LEXIS 65901, 2019 WL 1695982, at *14; *Laney v. City of St. Louis*, 2019 U.S. Dist. LEXIS 97510, 2019 WL 2423308, at *8 (E.D. Mo.).

The Court should deny the City's motion to the extent that it is based on official immunity.

ii.   **The arrests were not lawful.**

As discussed at length above, the arrests of Drew and Jennifer Burbridge were not lawful. The Burbridges were peacefully assembled, non-threatening and compliant. They were targeted for protected First Amendment activity. They were denied egress from the site. Essentially, the City created the justification for arresting them: you cannot leave, and now you are under arrest for not leaving.

WHEREFORE, Plaintiffs have presented sufficient evidence that there are disputes of material fact that must be presented to and determined by a jury. The City has failed to adduce evidence to support their immunity defenses. Plaintiffs respectfully request this Court deny the Defendants' motion for summary judgment

in its entirety and allow this case to proceed to a trial by jury; and for such further

relief as the Court may deem just and proper in the premises.


Respectfully submitted,

**NEWTON BARTH L.L.P.**


By:     /s/ ***Talmage E. Newton IV***
        Talmage E. Newton IV, MO56647
        talmage@newtonbarth.com
        Brandy B. Barth, MO56668
        bbarth@newtonbarth.com
        555 Washington Ave., Ste. 420
        St. Louis, Missouri 63101
        (314) 272-4490 – Telephone
        (314) 762-6710 – Facsimile

        Attorney for Plaintiffs

**PLAINTIFFS' EXHIBITS IN OPPOSITION TO SUMMARY JUDGMENT**

| Exhibit | Description |
|---|---|
| 1 | Drew Burbridge Deposition |
| 2 | Jennifer Burbridge Deposition |
| 3 | DVD with incident videos:<br>    a.  Enhanced police video.<br>    b.  Real Time Crime Center video. |
| 4 | Rose Declaration |
| 5 | Franks Declaration |
| 6 | Street Declaration |
| 7 | Davis Declaration |
| 8 | Rice Declaration |
| 9 | Ziegler Declaration |
| 10 | Newbold Declaration |
| 11 | Nelson Declaration |
| 12 | Baude Declaration |
| 13 | Maclean Declaration |
| 14 | Molina Declaration |
| 15 | Lewczuk Declaration |
| 16 | St. Louis City Ordinance 15.52.010 |
| 17 | St. Louis City Ordinance 17.16.275 |
| 18 | Sachs Testimony (*Ahmad*) |
| 19 | Sgt. Rossomanno Deposition Outtakes |
| 20 | P.O. Rachas Deposition Outtakes |
| 21 | Drew Burbridge – Injury Photos |
| 22 | Drew Burbridge – Arrest Photos |
| 23 | Drew Burbridge – Arrest Citation |
| 24 | Officer Burton Deposition Outtakes |
| 25 | Det. Wyms Deposition Outtakes |
| 26 | Jennifer Burbridge – Arrest Photos |
| 27 | Jennifer Burbridge – Arrest Citation |
| 28 | Templeton Agreement |
| 29 | Ahmad Declaration |
| 30 | Dreith Declaration |
| 31 | Smith Declaration |
| 32 | Wedding Declaration |
| 33 | Southwards Declaration |
| 34 | P.O. Biggins Deposition Outtakes |
| 35 | Dreith Testimony |
| 36 | Molina Testimony |
| 37 | Sommers Declaration |

| 38 | Green Declaration |
| 39 | Counihan Declaration |
| 40 | Hoffman Declaration |
| 41 | Rose Testimony |
| 42 | Kelly-Franks Testimony |
| 43 | Wedding Testimony |
| 44 | Mobley Declaration |
| 45 | Sommers Testimony |
| 46 | Thomas Declaration |
| 47 | Court order in *Ahmad, et al. v. City of St. Louis, et al.,* Cause No. 4:17 CV 2455 CDP (U.S.D.C., E.D.Mo.)(Doc. ###). |

## CERTIFICATE OF SERVICE

The undersigned hereby certifies that a true and accurate copy of the foregoing was served via the Court's electronic filing system upon all parties of record on this 10th day of September, 2019.

/s/ *T.E. Newton*

56