Keith Burton

5/23/2019

### Page 10

1  do you know who that officer is?
2      A   I believe that's Officer Rachas.
3      Q   Did you see Sergeant Rossomanno anywhere in
4  this video?
5      A   No.
6      Q   Let me back it up. I want to highlight one
7  individual here and see if you can identify them.
8          I'm going to tell you my impression of what
9  I see happening, but I want you to be guided by your
10 own eyes, here, okay? And the individual I'm going to
11 be interested in, you'll see -- we'll start from the
12 beginning. An individual is brought to the ground
13 here, and you and who we believe is Officer Rachas are
14 involved in an arrest there.
15         An individual in tactical gear appears to
16 walk by and do two deployments of some type of
17 chemical munition on that individual, okay? I'd like
18 you to be looking for that individual and then we're
19 going to talk about him, okay? Do you understand what
20 I'm asking for?
21     A   Yes.
22         (Video played.)
23 BY MR. NEWTON:
24     Q   I'm pausing it at the 26 second mark. Did
25 you see what I was describing? Let's back up. We'll

### Page 11

1  watch this as many times as we need to.
2          (Video played.)
3  BY MR. NEWTON:
4      Q   This individual.
5      A   Okay.
6      Q   Do you recognize him?
7      A   No, I don't.
8      Q   Do you want to watch it again or are you
9  pretty confident?
10     A   I mean, it could be Sergeant Rossomanno, but
11 I don't really know him that well --
12     Q   Fair enough.
13     A   -- to say that's definitely him.
14     Q   That's a fair answer. That's a little out
15 of order on how we normally do these things.
16         Have you ever had your deposition taken
17 before?
18     A   Yes.
19     Q   Have you had your deposition taken in
20 relation to the Stockley protests?
21     A   No.
22     Q   How many times have you given a deposition?
23     A   Three or four, best guess.
24     Q   Were the rest all criminal cases?
25     A   One was a criminal case. One was civil

### Page 12

1  litigation.
2      Q   Have you ever had a sustained complaint with
3  Internal Affairs?
4      A   No.
5      Q   Have you ever had a sustained complaint
6  against your POST license?
7      A   No.
8      Q   Do you currently hold a Class A
9  certification with POST?
10     A   Yes.
11     Q   Have you ever had, whether it's sustained or
12 not, any allegations against you in POST or Internal
13 Affairs as they relate to honesty or false reporting?
14     A   No.
15     Q   Have you ever been the defendant in a civil
16 lawsuit before this case?
17     A   Yes.
18     Q   How many times?
19     A   Once.
20     Q   What was that case about?
21     A   It was a car accident. On-duty car
22 accident, sorry.
23     Q   Have you ever been interviewed by Internal
24 Affairs regarding the events surrounding the Stockley
25 protest?

### Page 13

1      A   No.
2      Q   Have you ever been interviewed by the United
3  States Department of Justice or the U.S. Attorney's
4  Office regarding the events surrounding the Stockley
5  protest?
6      A   No.
7      Q   Same question for the Circuit Attorney's
8  office.
9      A   No.
10     Q   Have you ever drafted a report or summary of
11 the events surrounding the Stockley protest?
12     A   No.
13     Q   Have you ever been asked to?
14     A   No.
15     Q   Does that also include you've never
16 completed a use of force report related to the events
17 of the Stockley protest?
18     A   No.
19     Q   No, you have not?
20     A   No, I have not. Sorry.
21     Q   No, you're fine. This is really a natural
22 way of talking, okay? If I ask you a question, you
23 don't understand what I'm asking, will you stop me and
24 ask me to rephrase it?
25     A   Yes, I will.

4 (Pages 10 to 13)

EXHIBIT 24

Keith Burton
5/23/2019

**Page 14**

1  Q  And it's important that you use yeses, nos,
2  no uh-huhs or uh-uhs because she's going to write this
3  all down, okay?
4  A  Okay.
5  Q  So if you make a mistake, either I or your
6  attorney will correct you. Don't take it personally.
7  It's a tough way to talk.
8  A  Okay.
9  Q  What did you do to prepare for your
10  deposition today?
11  A  Met with my attorney.
12  Q  Has anyone from the police department given
13  you any instructions on how to respond to questions in
14  this deposition or as it relates to this case?
15  A  No.
16  Q  Have you ever done any type of after-action
17  review or debriefing regarding the events of the
18  Stockley protest?
19  A  No.
20  Q  Has anyone ever shown you photographs of
21  officers and seen whether you can identify anybody as
22  it relates to this case?
23  A  I met with Charlie Wall, Sergeant Wall, who
24  initially identified us, I believe, and went down
25  there and showed us some pictures of us, me and

**Page 15**

1  Officer Rachas down there. But other than that, no.
2  Q  I'm going to hand you what's been marked
3  previously in this case as Exhibit 2A through
4  discovery. Is that Officer Rachas?
5  A  I believe. I believe so, yeah.
6  Q  I'll hand you what's been previously marked
7  as 2B as well. Does that look like Officer Rachas?
8  A  Yes.
9  Q  I'm going to hand you what has been
10  marked -- previously been marked in this case as
11  Exhibits A, B and C through discovery. I'm going to
12  ask -- first of all, take a look at all three of
13  those. Do you recognize this individual?
14  A  It looks like Sergeant Rossomanno.
15  Q  Since you graduated from the academy, have
16  you received any training in crowd control?
17  A  Yes.
18  Q  Tell me about that.
19  A  When I was with St. Louis County Police
20  Department, they -- I guess they put all the newer
21  people, newer guys, through their CDT team or
22  whatever.
23  Q  And for the people who might eventually read
24  this transcript, what do you mean by CDT?
25  A  The civil disobedience team or training.

**Page 16**

1  Q  The events that are described in this
2  lawsuit date back to Sunday, I believe, September 17th
3  of 2019. What was your assignment that night?
4  A  2017?
5  Q  Yes. Did I say 19?
6  A  Yes.
7  Q  Sorry.
8  A  I was working in the First District.
9  Q  And were you just on patrol?
10  A  Yes.
11  Q  Did you have any special assignments?
12  A  No.
13  Q  Like were you deployed to any type of
14  documentation team, bike support, intelligence,
15  investigations?
16  A  No, I was not.
17  Q  Just the standard call-out for patrol
18  officers, correct?
19  A  Yes.
20  Q  Were you in any way deployed with the civil
21  response teams?
22  A  No.
23  Q  Did you attend any briefings that were given
24  to the civil response teams?
25  A  No.

**Page 17**

1  Q  And just for purposes of clarity, when I'm
2  saying civil response teams, I'm generally referring
3  to the crowd control, the groups that came in and the
4  tactical gear, shields, helmets, batons, chemical
5  stuff. Are we on the same page?
6  A  Yes. I understand. No, we were not briefed
7  with any of that.
8  Q  I will represent to you that that team did a
9  muster over off Hampton before they came downtown.
10  Did you attend that?
11  A  No.
12  Q  Did you do a roll call that night before you
13  went out?
14  A  Yes. South Patrol.
15  Q  What information did you receive about what
16  the department was expecting that night?
17  A  Very little, other than, you know, hey,
18  there's protests going on downtown, but, you know,
19  we're all assigned to the First District. So nothing
20  specifically what our purposes would be or if we were
21  to respond.
22  Q  Do you remember receiving any type of
23  intelligence briefings in advance of September 17,
24  2017?
25  A  Not that I can recall, no.

5 (Pages 14 to 17)

Keith Burton

5/23/2019

### Page 18

1  Q  Do you recall receiving any specific
2  additional training or counseling regarding civil
3  protests or responses?
4  A  Not that I can recall.
5  Q  Do you recall at any time after the events
6  that are described in this lawsuit being asked to
7  submit a report or anything to anyone in the
8  department?
9  A  No.
10 Q  Do you know Detective Brandon Wyms?
11 A  I know of him. I don't know him personally.
12 Q  Do you recall whether he asked for any
13 reports?
14 A  No.
15 Q  No, you don't recall or no, he didn't?
16 A  No, he didn't ask me specifically for any
17 type of reports or anything like that.
18 Q  Did you have any special equipment on this
19 night, the September 17th, other than your uniform kit
20 that you normally have on duty?
21 A  I was wearing what I would wear on patrol,
22 so no specialized equipment or anything.
23 Q  Why don't you in your own words tell me how
24 you came to be present at this scene.
25 A  We were working in the First District, just

### Page 19

1  on regular patrol, however you like to refer it to,
2  and there was a call -- not a call, but it was advised
3  over dispatch that people -- some other people from
4  the First and some other district are supposed to
5  respond downtown to assist in a protest. I can't -- I
6  don't know what the exact verbiage was, but I'm just
7  saying we were called to downtown over dispatch.
8  Q  What is the area of the First District at
9  the time in September of 2017?
10 A  The boundaries are east -- or on the west,
11 Kingshighway, on the north it's Meramec, and then it
12 goes to the river and then the county line.
13 Q  What was your shift that night?
14 A  I can't remember. It was the afternoon
15 shift.
16 Q  Were you on overtime by the time this took
17 place? And don't guess. If you're not sure, it's
18 fine.
19 A  I don't know. I'm sorry.
20 Q  That's fine. That's one of the other
21 instructions I should probably give you. I don't want
22 you to guess about anything. If you don't know, I
23 don't know is a fine answer.
24 A  Okay.
25 Q  Is it a fair statement that there were no

### Page 20

1  special instructions given to you regarding how to
2  interact with the crowd on this night?
3  A  Yes.
4  Q  Just it was -- okay. That's fine.
5     Did you receive any intelligence briefings
6  about anything surrounding the Stockley trial, verdict
7  or subsequent civil unrest?
8  A  No, no special instructions.
9  Q  In your own words, tell me what you were
10 doing in this video.
11 A  We were trying to flex cuff people for the
12 arrest teams.
13 Q  Who was directing you that evening?
14 A  It was a sergeant, and I don't know which
15 sergeant it was, that said we've got a bunch of flex
16 cuffs and we're supposed to be going there and
17 detaining people via flex cuffs.
18 Q  Tell me about when you -- presumably that
19 night you came from somewhere else in the First
20 District as a response to a radio call for assistance,
21 correct?
22 A  Yes.
23 Q  Walk me through kind of what led up to this.
24 Where did you respond to, who was telling you what to
25 do?

### Page 21

1  A  We responded to -- I believe we're outside
2  of the City Hall. And then I can't recall who was
3  actually giving orders at that point. I don't know.
4  Q  But you're kind of a utility player that
5  night, just doing what you're told?
6  A  Yes.
7  Q  Do you have any specific recollection of the
8  flex cuffing of the individual in the video that we
9  saw?
10 A  No. And I'm only watching the video. I
11 don't really recall that event.
12 Q  So is it a fair statement that if I asked
13 you specifics about your movements, his movements, the
14 movements of those around you, you'd just tell me to
15 refer to the video?
16 A  Yes.
17 Q  You have no specific recollection of that
18 individual or that 54 seconds in time; is that
19 correct?
20 A  Yes.
21 Q  That evening did you see anyone in the
22 department deploy chemical munitions?
23 A  No. But I knew people were getting sprayed
24 because you could smell it.
25 Q  So you knew it was happening, but you did

6 (Pages 18 to 21)

Sturm Reporting Services, Inc.
314.780.2816

f9a66733-684b-42a9-84f6-3232e5d14c18