## UNITED STATES DISTRICT COURT
## EASTERN DIVISION OF MISSOURI
## EASTERN DIVISION

DREW E. BURBRIDGE, *et al.*,     )
                                    )
        Plaintiff(s),         )
                                    )
v.                            )     No. 4:17-CV-02482-SRC
                                    )
CITY OF ST. LOUIS, MISSOURI, *et al.*,   )
                                    )
        Defendant(s).      )

## MEMORANDUM AND ORDER

This matter is before the Court on the Motion for Summary Judgment [89] of the City of St. Louis, Police Officers Marcus Biggins, Sgt. Brian Rossomanno, Samuel Rachas, and Keith Burton.   Plaintiffs oppose the Motion.   For the reasons set forth below, the Court grants the Motion in part and denies it in part.

## I.     FACTS AND BACKGROUND

On September 15, 2017, the 22nd Judicial Circuit Court of the City of St. Louis issued a ruling in the criminal case against former St. Louis Police Officer Jason Stockley, finding him not guilty.   In the days that followed, many people gathered in downtown St. Louis to protest the verdict.

Plaintiffs Drew E. Burbridge and Jennifer L. Burbridge are documentary filmmakers who were present in downtown St. Louis on the evening of September 17, 2017 to video-document the *Stockley* protests.   The Burbridges allege that officers of the St. Louis Metropolitan Police Department (SLMPD) violated their civil rights.   The Burbriges initiated this action on September 26, 2017, and have filed their Third Amended Complaint.   Doc. 70.   The Burbridges bring claims under 42 U.S.C. § 1983 for deprivation of their civil rights, civil conspiracy to deprive

them of their civil rights, and for failure to train or supervise.   The Burbridges also bring state law claims for assault and battery, false imprisonment, and malicious prosecution.

The Court finds the following facts uncontroverted for purposes of this Motion:[1]

## A.     The *Stockley* Verdict and Ensuing Protests

After the state trial court acquitted Jason Stockley on Friday, September 15, 2017, protests occurred in the City of St. Louis throughout the following weekend.   Lt. Colonel Gerald Leyshock was the incident commander for the SLMPD's response to protest activity that weekend. Protests during daylight hours were largely peaceful, with little or no property damage, and only sporadic incidents of violence.   However, in the evening hours of Friday night, September 15, protestors engaged in significant acts of property damage, including to the mayor's residence and to the Central West End area of the City.   Further, there were multiple reports of officers injured by acts committed by protestors on Friday night.   At that point, the SLMPD declared an unlawful assembly and ordered the crowd to disperse.   On Saturday evening, September 16, the SLMPD again received reports of property destruction and police officers surrounded by protestors.

## B.     September 17 Protests and SLMPD Response

On Sunday afternoon, September 17, a large group of protestors engaged in a peaceful march, starting and concluding at Police Headquarters on Olive Street.   Protests continued into Sunday evening.   At approximately 9:00 p.m., Leyshock received a report that an officer had been injured and that several protestors possessed weapons.   At approximately 10:40 p.m., Leyshock received reports that a group of protestors had gathered at the intersection of Tucker and Locust Street and was engaging with a unit of SLMPD's bicycle response team.   Major Daniel Howard,

---

[1] In support of their Motion for Summary Judgment, Defendants submitted a Statement of Uncontroverted Material Facts, Doc. 90, as required by Fed. R. Civ. P. 56(c)(1).   Plaintiffs' Opposition includes a response to Defendants' Statement of Uncontroverted Material Facts, noting those facts asserted by Defendants that the Burbriges do not dispute for purposes of this Motion.   Doc. 100, pg. 9-10.   The Burbridges have also submitted an Additional Statement of Material Facts, with citations to the record.   Doc. 100, pg. 11-30.   Defendants have submitted a response to Plaintiffs' Additional Statement of Material Facts, Doc. 101, noting those facts asserted by the Burbridges that Defendants do not dispute for purposes of this Motion.

who was on the scene with the bicycle response team, reported to Leyshock that individuals in the crowd at Locust and Tucker were being belligerent to police officers and throwing things at the officers.   In response to these reports, Leyshock ordered Sgt. Rossomanno to declare an unlawful assembly and to issue dispersal warnings.   Howard informed Leyshock that he did not believe he had enough officers to safely arrest the individuals who were engaging in an unlawful assembly. Leyshock then dispatched backup units from SLMPD's Civil Disobedience Teams to the downtown area to assist with making arrests.

At approximately 10:45 p.m., Sgt. Rossomanno issued an order declaring the assembly to be unlawful and ordering those present to disperse.[2]   Rossomanno's dispersal order included a warning that failure to disperse would be cause for arrest and that the use of chemical munitions was imminent.   Rossomanno issued the dispersal order multiple times through the public address system of his police vehicle, and also attempted to issue the dispersal order conversationally to individual groups of people who had gathered on Tucker Street between Locust and Washington.

### C.     Mass Arrests at Washington and Tucker

When Leyshock dispatched the Civil Disobedience Team units to the downtown area, he ordered them to arrest anyone that had not dispersed from the area once they arrived.   When the Civil Disobedience Team units arrived downtown, the group on Tucker Street had mostly migrated from the intersection of Tucker and Locust to the intersection of Tucker and Washington. Leyshock then ordered the Civil Disobedience Team units to arrest all individuals who had not dispersed from Washington and Tucker.   Sometime around midnight, multiple lines of police officers started gathering around the intersection of Washington and Tucker.   Many of the officers

---

[2] The Burbridges argue that a genuine issue of material exists as to whether SLMPD issued any dispersal orders because neither Drew nor Jennifer heard a dispersal order.   Doc. 100, pg. 9.   However, the Burbridges both testified that they did not arrive at the Washington and Tucker intersection until after 11:00 p.m.   Doc. 100-1, 34:17-35:14; Doc. 100-2, 28:9-28:18.   Thus, their testimony cannot controvert Sgt. Rossomanno's statement that he issued multiple dispersal orders beginning at 10:45 p.m. Doc. 90-9, ¶¶ 28-30.   Similarly, the Burbridges' testimony that they did not personally see anyone in the crowd throwing things at police officers does not controvert Leyshock's statement that he received reports of such behavior at approximately 10:40 p.m.   Doc. 90-4, ¶¶ 53-55.

were dressed in protective gear including helmets, shields, and batons.   The officers fanned out along the crosswalks at the intersection, cutting off all routes of egress.   Officers banged on their shields with their batons as they encircled the intersection.   Officers ordered the crowd to move back and to sit on the ground.   The officers then rushed forwarded and arrested the individuals who were caught in the intersection.   In total, officers arrested more than 100 people.   Several of the individuals in the group located at Washington and Tucker refused to follow otherwise lawful commands of the officers.

### D.    Drew and Jennifer Burbridge

Drew and Jennifer Burbridge arrived in the area of Washington and Tucker sometime after 11:00 p.m. on Sunday evening.   Their purpose in downtown St. Louis that evening was to observe and document the civil unrest following the *Stockley* verdict.   They brought with them a video camera.   Upon their arrival, the Burbridges observed a crowd of approximately 100 protestors in the area of Washington and Tucker.   Some were marching and demonstrating, and others were just standing around.   As the Burbridges approached the demonstration, they walked past a number of police officers, none of whom told the Burbridges that they could not be in the area or that they had to leave.   The Burbridges began videoing the activities of the protestors.   Neither of the Burbridges heard any orders to disperse.

The Burbridges were in the intersection of Washington and Tucker at approximately midnight when SLMPD officers began to encircle the intersection.   When they realized the officers were cutting off all egress, the Burbridges approached the police line and, orally identified themselves as members of the media, attempted to leave the area.   Unidentified officers in the police line told the Burbridges they could not leave.   The Burbridges then complied with police orders to move back and sit on the ground.

### E.      Arrest of Drew Burbridge

Defendant SLMPD Officers Samuel Rachas and Keith Burton arrived at the intersection of Washington and Tucker in response to a request from dispatch to respond downtown.   A superior officer ordered Rachas and Burton to place zip-tie restraints on the group of people in the Washington and Tucker intersection who were being placed under arrest.

While Drew[3] was sitting with Jennifer on the sidewalk, inside the police encirclement, he heard an unidentified officer say, "That's him."   Then Officers Rachas and Burton grabbed Drew and dragged him away from Jennifer by his arms.   Without standing Drew up, and before placing him in restraints, Rachas and Burton began to place Drew on the ground, face down, so that they could place restraints on his hands behind his back.   At no time from when Rachas and Burton grabbed him to when he was put prone on the ground did Drew resist the police.   Drew told Rachas and Burton that he is not a protestor, was not resisting, and was a member of the media.

Defendant Officer Marcus Biggins observed Rachas and Burton bring Drew to the ground. Biggins testified during his deposition that Drew was "not fighting" the officers, but was "fighting being arrested" and "squirming."   Biggins knelt down on Drew's legs while Rachas and Burton effected the arrest.   Drew had a knee placed on his neck, and was repeatedly struck by officers. He was kicked with a boot, struck on the back of the head, struck on the ribs, and struck on his shoulder.   At some point, he lost consciousness.[4]   Jennifer witnessed Drew being maced, stomped on, and struck by officers.   While Drew was on the ground with Rachas and Burton on top of him, Defendant Sgt. Rossomanno twice deployed mace in Drew's face.

---

3 This Order refers to the Burbridges by their first names only in the interest of clear identification, and not to imply familiarity.
4 For purposes of this Motion only, Defendants do not dispute this account of the arrest, i.e., that Drew was repeatedly struck by officers and lost consciousness.   *See* Doc. 101, pg. 18.   The Court has reviewed the video evidence of Drew's arrest and finds it inconclusive to either confirm or refute this account.   Doc. 90-11; Doc. 100-3.

Both parties have submitted video evidence of the arrest of Drew Burbridge.[5]   Although

the view of Drew's arrest and his interaction with the officers is frequently obstructed, some facts

are plainly observable in the video.   When Officers Rachas and Burton put Drew Burbridge on the

ground, Drew was not yet in wrist restraints.   Doc. 100-3, at 00:12.   Drew's arrest, measured

from when Officers Burton and Rachas pulled him from the crowd to when Burton and Rachas

finished restraining his hands with zip-ties and moved on, lasted approximately 30 seconds.   *Id.* at

00:10-00:42. The entire interaction between Drew and the officers, from the time Officers Burton

and Rachas pulled Drew from the crowd to when Officer Biggins escorted him from the scene,

lasted little more than a minute.   *Id.* at 00:10-01:33.

After being taken into custody, Drew was charged with "failure to disperse" and booked at

the St. Louis City Justice Center.   Drew was not charged with resisting arrest.   The Burbridges

have offered evidence that SLMPD instructed all officers who used force in the course of arrests

that evening to self-report their use of force.   Doc. 100-25, 71:3-20.   None of the Defendant

police officers completed a "use of force" report regarding the arrest of Drew Burbridge.

###    F.    Arrest of Jennifer Burbridge

When the police lines converged on the crowd at Washington and Tucker, Jennifer

Burbridge was kneeling with Drew on the sidewalk.   Jennifer testified that an SLMPD officer

sprayed pepper spray at another individual in the intersection while Jennifer and Drew were on the

sidewalk in close proximity.   The blast of pepper spray streamed over Jennifer's head where she

was kneeling and came down to irritate her eyes and throat.

Drew was holding Jennifer in his arms when he was grabbed and pulled away from her by

Officers Burton and Rachas.   An unidentified officer then lifted Jennifer by her armpits from her

crouched position.   Unidentified officers restrained Jennifer with zip-tie restraints and escorted

---

[5] *See* Doc. 90-11 (Defendants' Exhibit K); Doc. 100-3 (Plaintiffs' Exhibit 3).

her away from the scene.   One of the officers transporting Jennifer remarked to another officer "Look who I have", while another said "Did you like that?   Come back tomorrow and we'll do it again", and yet another asked "What did you think would happen?"

After being taken into custody, Jennifer was charged with "failure to disperse" and booked at the St. Louis City Justice Center.   Prior to her release from jail, Jennifer was required to undergo a pregnancy test, which she was forced to conduct in a cell with other female detainees. The detainees were told that everyone would have to take a pregnancy test prior to release, or no one would be released.   While Jennifer was taking the pregnancy test, a male corrections officer opened the cell door and looked in.

## II.    STANDARD

Defendants argue that the uncontroverted record entitles them to summary judgment on all all of the Burbridges' claims.   Summary judgment is proper if the evidence, viewed in the light most favorable to the nonmoving party, demonstrates no genuine issue of material fact exists and the moving party is entitled to judgment as a matter of law.   Fed. R. Civ. P. 56(c); *Cordry v. Vanderbilt Mortg. & Fin., Inc.*, 445 F.3d 1106, 1109 (8th Cir. 2006) (quoting *Bockelman v. MCI Worldcom, Inc.*, 403 F.3d 528, 531 (8th Cir. 2005)).   The proponent of a motion for summary judgment "bears the initial responsibility of informing the district court of the basis for its motion, and identifying those portions of 'the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any,' which it believes demonstrate the absence of a genuine issue of material fact."   *Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986) (quoting Fed. R. Civ. P. 56(c)).   The proponent need not, however, negate the opponent's claims or defenses.   *Id.* at 324–25.

In response to the proponent's showing, the opponent must "come forward with 'specific facts showing that there is a genuine issue for trial.'"   *Matsushita Elec. Indus. Co. v. Zenith Radio*

*Corp.*, 475 U.S. 574, 587 (1986) (quoting Fed. R. Civ. P. 56(e)).   A "genuine" dispute of material

fact is more than "some metaphysical doubt as to the material facts."   *Id.* at 586.   "[T]here is no

issue for trial unless there is sufficient evidence favoring the nonmoving party for a jury to return a

verdict for that party." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 249 (1986). "If the evidence

is merely colorable...or is not significantly probative...summary judgment may be granted."   *Id.* at

249–50 (citations omitted).

## III.   DISCUSSION

The Burbridges' eleven-count Complaint asserts claims against the City of St. Louis, Sgt.

Rossomanno, Officers Burton, Rachas, and Biggins, and an unidentified "John Doe" police

officer.   Doc. 70.   The Complaint names the police-officer Defendants in both their individual

and official capacities.[6]   In Counts I and II, brought pursuant to 42 U.S.C. § 1983, the Burbridges

allege that Defendants violated their First Amendment rights and retaliated against them for

exercising their First Amendment rights.   In Count III, also brought pursuant to 42 U.S.C. § 1983,

the Burbridges allege that Defendants violated their Fourth Amendment rights through the use of

excessive force and unlawful search and seizure.   In Count IV, the Burbridges assert a Fourteenth

Amendment due process claim pursuant to 42 U.S.C. § 1983 and allege that St. Louis City

ordinances regarding unlawful assembly and obstruction of traffic are unconstitutional facially and

as applied.   The Burbridges assert Counts I through IV against all Defendants.   In Counts V

through VIII, Jennifer and Drew separately bring Missouri state law claims for assault and battery

(Counts V, VI) and false imprisonment (Counts VII, VIII) against the police-officer Defendants.

The Burbridges bring Count IX pursuant to 42 U.S.C. § 1983 against the City of St Louis only,

alleging that the City's failure to train its police officers resulted in violations of the Burbridges'

---

[6] A claim against a public official in his or her "official capacity" is simply "another way of pleading an action against [the governmental] entity of which [the] officer is an agent."   *Kentucky v. Graham*, 473 U.S. 159, 165 (1985).   Thus, "an official-capacity suit is, in all respects other than name, to be treated as a suit against the entity." *Id.*

constitutional rights.   In Count X, the Burbridges allege that the police-officer Defendants violated Missouri state law forbidding malicious false prosecution.   Finally, the Burbridges bring Count XI against the police-officer Defendants pursuant to 42 U.S.C. § 1983, alleging that Defendants conspired to deprive them of their civil rights.

Defendants move for summary judgment on all Counts of the Burbridges' Complaint. Doc. 89.   Defendants argue that the police-officer Defendants are entitled to qualified immunity from all of the Burbridges' federal law claims and to official immunity from the Burbridges' state law claims.   As to the claims asserted against the City, Defendants argue that the ordinances are constitutional both facially and as applied, and that the Burbridges have failed to offer proof of failure to train.

As a preliminary matter, the Court dismisses all claims asserted in the Burbridges' Complaint against the unidentified "John Doe" defendant.   Discovery closed in this matter on June 3, 2019, and the case is set for trial on January 21, 2020.   Doc. 84.   "Fictitious parties must eventually be dismissed, if discovery yields no identities."   *Kemper Ins. Companies, Inc. v. Fed. Exp. Corp.*, 115 F. Supp. 2d 116, 125 (D. Mass. 2000); *see also Johnson v. Charps Welding & Fabricating*, Inc., No. CV 14-2081 (PAM/LIB), 2018 WL 3978111, at *3 (D. Minn. Aug. 20, 2018) ("[S]ummary judgment is not a dress rehearsal or practice run; it is the put up or shut up [sic] moment in a lawsuit, when a party must show what evidence it has that would convince a trier of fact to accept its version of the events.") (quoting *Steen v. Myers*, 486 F.3d 1017, 1022 (7th Cir. 2007).   Accordingly, the Court dismisses without prejudice the Burbridges' claims against the unidentified defendant.

### A.       Qualified Immunity

The Court first considers the qualified immunity claim of the Defendant police officers.

Section 1983 of Title 42 allows individuals to bring causes of action for violations of the U.S.

Constitution.   The section in relevant part states:

> Every person who, under color of any statute, ordinance, regulation, custom, or usage, of any State or Territory or the District of Columbia, subjects or causes to be subjected, any citizen of the United States or other person within the jurisdiction thereof to the deprivation of any rights, privileges, or immunities secured by the Constitution and laws, shall be liable to the party injured in an action at law, suit in equity, or other proper proceeding for redress . . .

42 U.S.C. § 1983.   "Qualified immunity shields a government official from suit under § 1983 if

his 'conduct does not violate clearly established statutory or constitutional rights of which a

reasonable person would have known.'"   *Kelsay v. Ernst*, 933 F.3d 975, 979 (8th Cir. 2019)

(quoting *Harlow v. Fitzgerald*, 457 U.S. 800, 818 (1982)).   When a defendant invokes a claim of

qualified immunity, the burden falls on the plaintiff to show: "(1) the facts, viewed in the light

most favorable to the plaintiff[], demonstrate the deprivation of a constitutional right; and (2) the

right was clearly established at the time of the deprivation."   *Snider v. City of Cape Girardeau*,

752 F.3d 1149, 1155 (8th Cir. 2014) (quoting *Baribeau v. City of Minneapolis*, 596 F.3d 465, 474

(8th Cir. 2010)).   Thus, to determine whether a defendant is qualifiedly immune, the Court

considers whether the alleged facts demonstrate that his conduct violated a constitutional right

and, if so, whether the right claimed was clearly established at the time of the alleged injury.

*Howard v. Kan. City Police Dep't*, 570 F.3d 984, 988 (8th Cir. 2009).   "If the answer to either

question is no," then the defendant is qualifiedly immune.   *Doe v. Flaherty*, 623 F.3d 577, 583

(8th Cir. 2010).

Defendants argue the Defendant officers are qualifiedly immune from all of the

Burbridges' federal § 1983 claims, including the First Amendment retaliation claims (Counts I and

II), the Fourth Amendment excessive force and unlawful search and seizure claims (Count III),

and the civil conspiracy claim (Count XI).   Doc. 93.

### 1.    Unlawful Search and Seizure

The Burbridges allege that their arrests on September 17, 2017 were unlawful seizures in

violation of the Fourth Amendment to the U.S. Constitution.   Doc. 70, ¶¶ 107-108.   In relevant

part, the Fourth Amendment provides:

> The right of the people to be secure in their persons, houses, papers, and effects,
> against unreasonable searches and seizures, shall not be violated, and no Warrants
> shall issue, but upon probable cause….

U.S. Const. amend. IV.   "A warrantless arrest does not violate 'the Fourth Amendment if it is

supported by probable cause, and an officer is entitled to qualified immunity if there is at least

'arguable probable cause.'" *White v. Jackson*, 865 F.3d 1064, 1074 (8th Cir. 2017) (quoting

*Borgman v. Kedley*, 646 F.3d 518, 522–23 (8th Cir. 2011).   The Court finds that the Defendant

officers are qualifiedly immune from the Burbridges' claims for unlawful search and seizure

because the officers had at least arguable probable cause for the arrests.

In *Bernini v. City of St. Paul,* 665 F.3d 997 (8th Cir. 2012), the Eighth Circuit considered

Fourth Amendment challenges to mass arrests during protests at the 2008 Republican National

Convention.   In upholding dismissal of the claims against police officers, the Eighth Circuit

affirmed the principle that "the Fourth Amendment 'is satisfied if the officers have grounds to

believe all arrested persons were a part of the *unit* observed violating the law.'" *Id.* at 1003

(quoting *Carr v. District of Columbia*, 587 F.3d 401, 408 (D.C. Cir. 2009) (emphasis in original).

In the present case, the uncontroverted evidence demonstrates that the Defendant officers

had grounds to believe that the Burbridges were part of a unit observed violating the law.   It is

unlawful in the City of St. Louis to congregate for the purpose of breaking the law or to refuse a

police officer's lawful order to disperse.   St. Louis City Ordinance 15.52.010 provides:

> Any two persons who shall, in this City, assemble together, or, being assembled,
> shall act in concert to do any unlawful act with force or violence, against the
> property of this City, or the person or property of another, or against the peace or to
> the terror of others, and shall make any movement or preparation therefor, and
> every person present at such meeting or assembly, who shall not endeavor to
> prevent the commission or perpetration of such unlawful act, shall be guilty of a
> misdemeanor.

St. Louis City Ordinance 17.16.275 provides in relevant part:

> A. No person, or persons congregating with another or others, shall stand or
> otherwise position himself or herself in any public place in such a manner as to
> obstruct, impede, interfere, hinder or delay the reasonable movement of vehicular
> or pedestrian traffic.
>
> …
>
> E. No person who has committed an act or acts within the description of
> subsections (A) through (D) above, upon being given an order by a police officer,
> … to disperse, clear, or otherwise move, shall fail or refuse to obey such order.
> Such failure or refusal shall constitute the separate offense of failure to obey a
> dispersing order by a police officer….

Leyshock ordered Sgt. Rossomanno to declare an unlawful assembly in the area of Locust and

Tucker after receiving reports that individuals in the crowd were throwing objects at police

officers.   By the time the Civil Disobedience Team units arrived downtown to begin the mass

arrests, the group at Locust and Tucker had mostly migrated to the intersection of Washington and

Tucker.   Sgt. Rossomanno issued multiple dispersal orders to the crowd using the public address

system of his vehicle before the mass arrests began.   And several individuals in the group located

at Washington and Tucker were refusing to follow otherwise lawful commands of police officers.

On these facts, the Court finds that the Defendant officers, when they encountered the Burbridges

among the group of people assembled at Washington and Tucker, had objectively-reasonable

grounds to believe that the Burbridges were part of the unit observed violating the law.

Arguable probable cause exists "even where an officer mistakenly arrests a suspect

believing it is based in probable cause if the mistake is objectively reasonable."   *White*, 865 F.3d

at 1074 (internal quotation marks omitted).   A superior officer ordered Burton and Rachas to arrest the crowd of people at the Washington and Tucker intersection.   Under the circumstances described above, it was objectively reasonable for Burton and Rachas to believe their superior officer had probable cause to issue the arrest order.   Officer Biggins assisted with the arrest of Drew Burbridge only after he observed Rachas and Burton initiate the arrest.   It was objectively reasonable for Biggins to believe his fellow officers were acting on probable cause.

The fact that neither Drew nor Jennifer heard the dispersal order, and that both requested to leave the area before arrests began, does not change the Court's qualified immunity determination. No evidence suggests that any of the Defendant officers were aware the Burbridges had asked to leave or hadn't heard the dispersal order.   Assuming, *arguendo*, that no *actual* probable cause existed to arrest the Burbridges because they did not hear the dispersal order or because they had asked to leave, the officers still had *arguable probable cause* because—without knowledge of those facts—their mistaken belief that they had probable cause was objectively reasonable.

### 2.    First Amendment Retaliation – Retaliatory Arrest

The Court next considers the Defendant officers' claim of qualified immunity from the Burbridges' First Amendment claims.   "[T]he law is settled that as a general matter the First Amendment prohibits government officials from subjecting an individual to retaliatory actions, including criminal prosecutions, for speaking out."   *Hartman v. Moore*, 547 U.S. 250, 256 (2006). To establish a First Amendment retaliation claim under 42 U.S.C. § 1983, the plaintiff must show (1) "he engaged in a protected activity;" (2) "the government official took adverse action against him that would chill a person of ordinary firmness from continuing in the activity;" (3) "the adverse action was motivated at least in part by the exercise of the protected activity;" and (4) "lack of probable cause or arguable probable cause." *Hoyland v. McMenomy*, 869 F.3d 644, 655 (8th Cir. 2017) (quoting *Peterson v. Kopp*, 754 F.3d 594, 602 (8th Cir. 2014)).   Under the third

prong, "[r]etaliation need not have been the sole motive, but it must have been a 'substantial factor' in the decision to arrest." *Baribeau v. City of Minneapolis*, 596 F.3d 465, 481 (8th Cir. 2010) (quoting *Kilpatrick v. King*, 499 F.3d 759, 767 (8th Cir. 2007)).   "Furthermore, the plaintiffs must show that the retaliatory motive was a 'but-for' cause of the arrest—i.e., that the plaintiffs were 'singled out' because of their exercise of constitutional rights." *Id.*

In the present case, the Defendant officers are qualifiedly immune from the Burbridges' § 1983 claim of retaliatory arrest because, as discussed above, the officers had at least arguable probable cause for the arrests.   Additionally, the Burbridges have failed to show that a retaliatory motive on the part of any of the Defendant officers was a 'but-for cause" of the arrests.   Certain unidentified officers made comments to the Burbridges that could suggest animus towards the Burbridges for exercising their First Amendment rights as journalists.   One officer asked Drew "do you want to take my picture now, motherf*cker?"   Another asked Jennifer "what did you think would happen?"   But even if the Burbridges could link the Defendant officers to these comments, the Burbridges still would not have shown that retaliatory animus was a "but-for" cause of the arrests.   The officers at Washington and Tucker were under orders to arrest everyone at the intersection who had not dispersed, and the SLMPD ultimately arrested more than 100 people. On these facts, no evidence shows that the officers singled out Drew and Jennifer for arrest because of their exercise of First Amendment rights.

### 3.   Excessive Force

The Court next considers the Defendant officers' claim of qualified immunity from the Burbridges' § 1983 excessive force claims.   "[T]he question whether an officer has used excessive force requires careful attention to the facts and circumstances of each particular case, including the severity of the crime at issue, whether the suspect poses an immediate threat to the safety of the officers or others, and whether he is actively resisting arrest or attempting to evade

arrest by flight." *Kisela v. Hughes*, 138 S. Ct. 1148, 1152 (2018).   "'The reasonableness of a particular use of force must be judged from the perspective of a reasonable officer on the scene, rather than with the 20/20 vision of hindsight.'   And '[t]he calculus of reasonableness must embody allowance for the fact that police officers are often forced to make split-second judgments—in circumstances that are tense, uncertain, and rapidly evolving—about the amount of force that is necessary in a particular situation.'"   *Id.* (quoting *Graham v. Connor*, 490 U.S. 386, 396 (1989)).   In other words, courts do not sit in second-guessing judgment of moment-to-moment police conduct but review the conduct for objective reasonableness in view of the facts as a whole, "without regard to [the officers'] underlying intent or motivation."   *Graham*, 490 U.S. at 396 ("Not every push or shove, even if it may later seem unnecessary in the peace of a judge's chambers, violates the Fourth Amendment.") (internal citations omitted).   The Court analyzes separately the excessive force claims of Jennifer and Drew.

The Court finds that all Defendant officers are entitled to summary judgment on Jennifer's § 1983 claim of excessive force.   As an initial matter, the Burbridges have offered no evidence that Officers Burton, Rachas, or Biggins had any involvement in Jennifer's arrest, or that they used force—excessive or otherwise—against Jennifer in any way.   Thus, the Court grants summary judgment for these officers on Jennifer's excessive force claim.

The Burbridges claim Jennifer was subjected to the "indiscriminate" use of pepper spray. Doc. 100, pg. 20.   Defendants do not dispute that Sgt. Rossomanno used pepper spray at the intersection of Washington and Tucker that evening.   However, the Burbridges have offered no evidence that Sgt. Rossomanno delivered the blast of pepper spray that affected Jennifer.   Further, Jennifer's own testimony does not support her claim that SLMPD officers "indiscriminately" used pepper spray.   Jennifer's testimony establishes that the SLMPD officer who used pepper spray near her was intentionally targeting another individual.   That pepper spray blast affected Jennifer

by proximity.   Doc. 100-2, 36:3-37:20.   Thus, Jennifer's testimony describes negligence, and negligently-inflicted harm is "categorically" insufficient to support a § 1983 excessive force claim. *Kingsley v. Hendrickson*, 135 S. Ct. 2466, 2472 (2015); *see also Lawyer v. City of Council Bluffs*, 361 F.3d 1099, 1105 (8th Cir. 2004) (pepper spray may be used to effectuate arrest even if it is "foreseeable" non-offending parties may be affected).   Accordingly, the Court grants summary judgment in favor of Sgt. Rossomanno on Jennifer's excessive force claim.

Conversely, the Court finds that the Defendant officers are not entitled to qualified immunity on Drew's § 1983 claim of excessive force.   In 2009, the Eighth Circuit held it was "clearly established" that the "gratuitous" use of force "against a suspect who is handcuffed, not resisting, and fully subdued is objectively unreasonable under the Fourth Amendment."   *Krout v. Goemmer*, 583 F.3d 557, 566 (8th Cir. 2009); *see also White*, 865 F.3d at 1080 (force was objectively unreasonable where suspect was lying on the ground, handcuffed, and not resisting arrest while officers kicked, punched, and pepper sprayed him).

Officers restrained Drew, placed a knee on his neck, and repeatedly struck him.   Officers kicked Drew with a boot, and delivered blows to his head, ribs, and shoulder.[7]   Sgt. Rossomano twice sprayed pepper spray in Drew's face while Drew was on the ground with Officers Rachas and Burton on top of him.   Jennifer saw her husband being pepper sprayed, stomped on, and hit on the head.   At some point during the altercation, Drew lost consciousness.

Drew did not resist the officers at any time from when Rachas and Burton pulled him from the crowd to when they placed him prone on the ground.   The Parties apparently dispute whether—or at least how much—Drew resisted arrest after the officers put him on the ground.

---

[7] Drew did not individually identify the officers who were striking him, Doc. 100-1, but that fact alone does not entitle the Defendant officers to summary judgment.   *See White*, 865 F.3d at 1081 (denying summary judgment on excessive force claim where other evidence was sufficient to identify defendant officers who "personally participated" in the arrest).   Here, Defendants do not dispute that each of the Defendant officers participated in Drew's arrest and used force against Drew during the arrest.

Drew told Rachas and Burton that he was not resisting.   Officer Biggins offered the equivocal

testimony that Drew was "not fighting" the officers, but "was fighting being arrested" and

"squirming."   Doc. 90-15, 44:12-44:13.   The Court finds the record, including the video

evidence, to be inconclusive as to how much or how long Drew resisted arrest when he was prone

on the ground.   However, it is self-evident that Drew could not resist arrest while unconscious.

Thus, the Court finds a genuine dispute of material fact as to whether the Defendant officers

struck, kicked, and pepper sprayed Drew while he was unconscious and not resisting arrest.

Accordingly, the Court denies the Defendant officers' motion for summary judgment on Drew's

excessive force claim.   *See White*, 865 F.3d at 1080; *see also Lambert v. City of Dumas*, 187 F.3d

931, 936 (8th Cir. 1999) (a factual dispute "regarding the amount and degree of force

used…establishes a genuine issue of material fact for trial precluding summary judgment" on a

claim of qualified immunity).

### 4.        First Amendment Retaliation – Use of Force

As discussed above, the Defendant officers are qualifiedly immune from the Burbridges'

claim of First Amendment retaliatory arrest because the arrests were supported by at least arguable

probable cause.   However, arrest is not the only "adverse action" at issue in this case.   *Peterson*,

754 F.3d at 602 ("To establish a First Amendment retaliation claim under 42 U.S.C. § 1983, the

plaintiff must show (1) he engaged in a protected activity, (2) the government official took adverse

action against him that would chill a person of ordinary firmness from continuing in the activity,

and (3) the adverse action was motivated at least in part by the exercise of the protected activity.").

The Burbridges also allege the Defendant officers used excessive force.   If the Defendant officers

used excessive force against the Burbridges, and that use of force was motivated at least in part by

the Burbridges's protected First Amendment activity, then the Burbridges have a claim for First

Amendment retaliation cognizable under § 1983.   *Id.* (affirming summary judgment on retaliatory

arrest claim because arrest was supported by arguable probable cause but overturning summary judgment on retaliatory use of force claim).

Jennifer's claim for excessive force against the Defendant officers fails, *see* Section III.A.3, *supra*, thus her claim for First Amendment retaliation as to Defendants officers' use of force also fails.   Conversely, the Court has found that Defendants are not entitled to summary judgment on Drew's excessive force claim.   Just before Officers Rachas and Burton pulled Drew from the crowd, he heard an officer say, "That's him." Doc. 100-1, 50:1-50:13.   Drew also heard officers ask "Do you want to take my picture now, motherf\*cker?" and "Do you want me to pose for you?"   Doc. 100-1, 110:25-111:5.   From these comments,[8] a reasonable jury could infer that the officers were singling Drew out because of his exercise of protected First Amendment rights. *Peterson*, 754 F.3d at 603 ("The causal connection is generally a jury question ... [unless] the question is so free from doubt as to justify taking it from the jury.").

The officers struck and kicked Drew to the point of unconsciousness.   Prior to his arrest, Drew was engaging in protected First Amendment activity, i.e., video-recording the protests. Being beaten to the point of unconsciousness would chill a person of ordinary firmness from engaging in this activity.   And a reasonable jury could infer, based on the comments made by the officers, that retaliatory animus motivated the officers at least in part.   *Id.*   Accordingly, the Court denies Defendants' motion for summary judgment on Drew's First Amendment retaliation claim related to the officers' alleged use of excessive force.

### 5.    Civil Conspiracy

The Burbridges assert a § 1983 claim against the Defendant officers for civil conspiracy to deprive constitutional rights.   To prove a § 1983 conspiracy claim, a plaintiff must show: (1) that

---

[8] Drew could not individually identify the officers who made these comments, but he did testify that they were same officers who directly engaged with him "hands-on." Doc. 100-1, 111:6-111:11.   The Defendant officers do not dispute that they each participated in Drew's arrest and used force in the course of the arrest.

the defendant conspired with others to deprive him of constitutional rights; (2) that at least one of

the alleged co-conspirators engaged in an overt act in furtherance of the conspiracy; and (3) that

the overt act injured the plaintiff.   *White v. McKinley*, 519 F.3d 806, 814 (8th Cir. 2008).   "The

plaintiff is additionally required to prove a deprivation of a constitutional right or privilege in order

to prevail on a § 1983 civil conspiracy claim." *Id.*   The only constitutional claims against the

Defendant officers that survive summary judgment are Drew's § 1983 excessive force claim and

the related claim of First Amendment retaliation, so any conspiracy claim must relate to those

allegations.

"For a claim of conspiracy under Section 1983, the plaintiff need not show that each

participant knew 'the exact limits of the illegal plan ...,' but the plaintiff must show evidence

sufficient to support the conclusion that the defendants reached an agreement to deprive the

plaintiff of constitutionally guaranteed rights."   *White*, 519 F.3d at 816 (quoting *Larson by Larson*

*v. Mille*r, 76 F.3d 1446, 1458 (8th Cir. 1996).   The Burbridges argue that the fact none of the

Defendant officers completed a "use of force" report after Drew's arrest is evidence the officers

reached an agreement to deprive Drew of his civil rights.   Doc. 100, pg. 51.

"The question of the existence of a conspiracy to deprive the plaintiffs of their

constitutional rights should not be taken from the jury if there is a possibility the jury could infer

from the circumstances a 'meeting of the minds' or understanding among the conspirators to

achieve the conspiracy's aims."   *White*, 519 F.3d at 816.   "[T]he elements of a conspiracy are

rarely established through means other than circumstantial evidence, and summary judgment is

only warranted when the evidence is so one-sided as to leave no room for any reasonable

difference of opinion as to how the case should be decided."   *Id.*   Although the Burbridges'

evidence of a "meeting of the minds" among the Defendant officers is circumstantial, the Court

cannot say the evidence is "so one-sided" that no reasonable jury could infer the existence of a

conspiracy.   An officer said "that's him" before Officers Rachas and Burton pulled Drew from the

crowd.   None of the Defendant officers completed a "use of force" report,[9] even though Drew was

struck, kicked, maced, and rendered unconscious.   The facts do not rise to the level of the "so

one-sided as to leave no room for any reasonable difference of opinion as to how the case should

be decided[]" standard.   *White*, 519 F.3d at 816.   Accordingly, the Court denies summary

judgment on Count XI as to the Defendant officers.

### B.   Official Immunity

The Court now turns to the Defendant officers' claim of official immunity from the

Burbridges' state law claims.[10]   "Under Missouri law, the official immunity doctrine protects

public officials from liability for injuries arising out of their discretionary acts or omissions".

*Reasonover v. St. Louis Cty., Mo.*, 447 F.3d 569, 585 (8th Cir. 2006).   Official immunity protects

public officials from liability for alleged acts of ordinary negligence committed during the course

of their official duties for the performance of discretionary acts.   *Davis v. Lambert-St. Louis Int'l*

*Airport*, 193 S.W.3d 760, 763 (Mo. banc 2006).   An act is discretionary when it requires "the

---

[9] The Defendant officers' failure to complete use of force reports, standing alone, may be insufficient to establish a conspiracy to target Drew for excessive force.   The court in *Jellyman v. City of Worcester*, 354 F. Supp. 3d 95 (D. Mass. 2019) considered a similar claim:

> In cases such as these, the First Circuit has held "the conspiracy to be distinct from the events that triggered the need for it." *Id.* (citation omitted); *see also Landrigan v. City of Warwick*, 628 F.2d 736, 741 (1st Cir. 1980) (holding excessive force and subsequent coverup to be "separate and distinct wrongs resting on different factual bases"). Consequently, "[f]or such a claim to be successful, the cover-up must result in an independent constitutional violation—such as interfering with a plaintiff's ability to seek judicial redress." *Watson v. Perez*, 168 F. Supp. 3d 365, 373 (D. Mass. 2016) (citations omitted); *see also Correia v. Town of Framingham*, 969 F. Supp. 2d 89, 98 (D. Mass. 2013) ("[T]he filing of a false police report does not, by itself and without further consequences to the plaintiff, violate § 1983.   This Court is persuaded that an officer's failure to file a police report, in furtherance of an alleged conspiracy to cover-up wrong-doing, does not constitute an independent constitutional violation and therefore cannot support plaintiff's' cover-up conspiracy claim." (citation omitted) ); *Shea v. Porter*, 2013 WL 1339671, at *4-5 (D. Mass. Mar. 29, 2013) (granting summary judgment for a Section 1983 conspiracy claim where there was no evidence the conspiracy predated the incident but instead was a cover-up afterwards and therefore it was "far from clear from plaintiff's briefing what constitutional violation is alleged to have resulted from the cover-up").

*Jellyman*, 354 F.Supp at 99.

[10] The Burbridges assert their state law claims only against the individual police-officer Defendants.   The Burbridges' original complaint also asserted state law claims against the City, *see* Doc. 1, but the Burbridges voluntarily dismissed those claims after the City moved to dismiss on the basis of sovereign immunity.   Docs. 10, 14, 15.

exercise of reason in the adaption of means to an end, and discretion in determining how or whether an act should be done or a course pursued." *Id*.   Official immunity does not apply, however, to discretionary acts done in bad faith or with malice.   *State ex rel. Twiehaus v. Adolf*, 706 S.W.2d 443, 446 (Mo. 1986).   "The relevant definition of bad faith or malice in this context ordinarily contains a requirement of actual intent to cause injury."   *Id.* at 447.

### 1.   False Imprisonment

Drew and Jennifer each assert Missouri state law claims for false imprisonment, also known as false arrest.[11]   The elements of false imprisonment are (1) detention or restraint of the plaintiff against his or her will, and (2) the unlawfulness of the detention or restraint.   *Rankin v. Venator Grp. Retail, Inc.*, 93 S.W.3d 814, 822 (Mo. Ct. App. 2002).   Justification is a complete defense to the cause of action.   *Id.*   "Deciding whether or not to arrest someone is a matter of discretion—the officer must decide what course should be pursued based on the circumstances at hand."   *Blue v. Harrah's N. Kansas City, LLC*, 170 S.W.3d 466, 479 (Mo. Ct. App. 2005). Accordingly, the Defendant officers have official immunity for their participation in the arrests of the Burbridges unless they acted in bad faith or with malice.   *Id.*

As discussed in Section III.A.2, *supra*, uncontroverted evidence shows that the officers were under orders to arrest everyone at the Washington and Tucker intersection.[12]   SLMPD officers arrested more than 100 people, including the Burbridges.   Thus, the Burbridges have failed to show that malice or bad faith on the part of the Defendant officers motivated Drew or Jennifer's arrest.[13]   Accordingly, official immunity applies and the Court grants summary judgment for the Defendant officers on the Burbridges' false imprisonment claims.

---

[11] False imprisonment and false arrest are synonymous under Missouri law.   *See Highfill v. Hale*, 186 S.W.3d 277, 280 (Mo. 2006).
[12] Lt. Colonel Leyshock, who ordered the arrest of all individuals who had not dispersed from Washington and Tucker, is not a defendant in this action.
[13] In contrast to the claim for civil conspiracy, which focuses on the motivation for the officers' use of force on Drew, this claim focuses on the motivation for the arrest.

### 2.      Malicious Prosecution

The Burbridges also assert state law claims for malicious prosecution against the Defendant officers.   The elements of malicious prosecution are: "1) commencement of an earlier suit against plaintiff; 2) instigation of the suit by defendant; 3) termination of the suit in plaintiff's favor; 4) lack of probable cause for the suit; 5) malice by defendant in instituting the suit; and 6) damage to plaintiff resulting from the suit."   *State ex rel. Police Ret. Sys. of St. Louis v. Mummert*, 875 S.W.2d 553, 555 (Mo. 1994).

The Burbridges were charged with "failure to disperse" and those charges were later dropped.   The record contains no evidence that any of the Defendant officers played any role in instigating charges against either of the Burbridges apart from their participation in Drew's arrest. Thus, similar to the false imprisonment claim, this claim focuses on the officers' conduct in initiating the arrest.   Assuming without deciding that merely assisting in an arrest could constitute "instigation" of charges,[14] the Court finds the fifth element—malice in instituting the suit—dispositive.   "Malice" necessary to support a claim of malicious prosecution means the defendant "must have committed the acts complained of primarily for the purpose of harming the plaintiff."   *Sanders v. Daniel Int'l Corp.*, 682 S.W.2d 803, 813 (Mo. banc 1984).   As discussed above, Officers Burton and Rachas initiated the arrest of Drew Burbridge because a superior officer ordered them to arrest everyone in the intersection who had not dispersed.   Officer Biggins and Sgt. Rossomanno assisted in that arrest.[15]   Thus, the Burbridges have failed to establish the elements of malicious prosecution against any of the Defendant officers.

---

[14]  A person's acts may be the legal cause of prosecution if instituted at his insistence and request.   *Palermo v. Cottom*, 525 S.W.2d 758, 763 (Mo. App. 1975).   "To impose liability there must be affirmative action by way of advice, encouragement, pressure or something similar in the institution, or causing the institution of the prosecution."   *Id*.

[15]  The record contains no evidence that any of the Defendant officers participated in the arrest of Jennifer Burbridge, so they are entitled to summary judgment on her claim of malicious prosecution for that reason alone.

### 3.      Assault and Battery

Drew and Jennifer each bring state law claims for assault and battery against Defendant officers.    The Defendant officers claim the protection of official immunity.

Jennifer asserts a claim of assault and battery against Sgt. Rossomanno.    "Under Missouri law, a law enforcement officer 'is answerable in damages as for assault and battery only when in the performance of his duty in making the arrest he uses more force than is reasonably necessary for its accomplishment.'"   *Schoettle v. Jefferson Cty.*, 788 F.3d 855, 861 (8th Cir. 2015) (quoting *Neal v. Helbling*, 726 S.W.2d 483, 487 (Mo. Ct. App. 1987)).    Jennifer alleges that Rossomanno "physically assaulted [her] by spraying chemicals on her."   Doc. 70, ¶ 125.    First, as discussed above, the record contains no evidence that Sgt. Rossomanno used pepper spray on Jennifer. Second, even if Sgt. Rossomanno's use of pepper spray on Drew affected Jennifer by proximity, Rossomanno is entitled to official immunity from Jennifer's assault and battery claim.    "[A] police officer's decision to use force in the performance of his duties is discretionary rather than ministerial."   *Davis v. White*, 794 F.3d 1008, 1013 (8th Cir. 2015).    Thus, official immunity protects Rossomanno from Jennifer's assault and battery claim unless he acted with malice or bad faith—that is, an "actual intent to injure" Jennifer.   *Twiehaus*, 706 S.W.2d at 446.    The Burbridges have offered no evidence from which a reasonable jury could infer that Rossomanno intended to injure Jennifer.    Accordingly, the Court grants summary judgment for Sgt. Rossomanno on Jennifer's assault and battery claim.

Drew asserts a claim of assault and battery against Sgt. Rossomanno and Officers Biggins, Rachas, and Burton.    Unlike Jennifer's claim against Rossomanno, undisputed evidence shows that each of these officers used force against Drew during his arrest.    The Court has already found a genuine dispute of material fact as to whether the Defendant officers struck, kicked, and pepper sprayed Drew while he was unconscious and not resisting arrest.   *See* Section III.A.3, *supra*.

Taken in the light most favorable to Drew, these facts could reasonably support an inference that the officers acted with malice or bad faith, *i.e.*, an actual intent to injure.   Under these circumstances, whether official immunity applies is a question of fact that must be considered by the jury.   *Blue*, 170 S.W.3d at 480.   Accordingly, the Court denies the Defendant officers' motion for summary judgment on Drew's assault and battery claim.

    **C.**    **Municipal Liability**

The Court now turns to the Burbridges' municipal liability claims against the City of St. Louis.[16]   A municipality cannot be held liable under 42 U.S.C. § 1983 on a *respondeat superior* theory—that is, a municipality cannot be held liable solely because it employs a tortfeasor. *Monell v. Dep't of Soc. Serv.*, 436 U.S. 658, 690 (1978).   Section 1983 liability for a constitutional violation may attach to a municipality if the violation resulted from (1) an official municipal policy, (2) an unofficial custom, or (3) a deliberately indifferent failure to train or supervise.   *Id.* at 690-91*; City of Canton, Ohio v. Harris*, 489 U.S. 378, 388–89 (1989).   Different analytical frameworks apply to municipal policies and customs.   *Bd. of Cty. Comm'rs of Bryan Cty., Okla. v. Brown*, 520 U.S. 397, 404 (1997); *Mettler v. Whitledge*, 165 F.3d 1197, 1204 (8th Cir. 1999).   As the Eighth Circuit explained in *Mettler*, "a 'policy' is an official policy, a deliberate choice of a guiding principle or procedure made by the municipal official who has final authority regarding such matters."   165 F.3d at 1204 (citing *Ware v. Jackson Cty.*, 150 F.3d 873, 880 (8th Cir. 1998)). In contrast, a "custom" is a "practice [that] is so widespread as to have the force of law."   *Brown*, 520 U.S. at 404; *see also Ware,* 150 F.3d at 880 (8th Cir. 1998) ("A plaintiff may establish municipal liability under § 1983 by proving that his or her constitutional rights were violated by an action pursuant to official municipal policy or misconduct so pervasive among non-policymaking

---

[16]  This includes the Burbridges' claims against Defendant City of St. Louis and against the Defendant officers in their official capacities.   *See* note 6, supra.

employees of the municipality as to constitute a custom or usage with the force of law.") (internal quotation marks omitted).

Municipal liability claims based on a theory of inadequate training are an "extension" of claims challenging an unconstitutional policy or custom. *Marsh v. Phelps Cty.*, 902 F.3d 745, 751 (8th Cir. 2018). "Only where a failure to train reflects a 'deliberate' or 'conscious' choice by the municipality can the failure be properly thought of as an actionable city 'policy.'" *City of Canton*, 489 U.S. at 379.

Further, regardless of whether a plaintiff seeks to establish municipal liability on the basis of official policy, custom, or failure to train, the plaintiff must "demonstrate that, through its deliberate conduct, the municipality was the 'moving force' behind the injury alleged. That is, a plaintiff must show that the municipal action was taken with the requisite degree of culpability and must demonstrate a *direct causal link* between the municipal action and the deprivation of federal rights." *Id.* at 404 (emphasis added). "Where a plaintiff claims that the municipality has not directly inflicted an injury, but nonetheless has caused an employee to do so, *rigorous standards of culpability and causation must be applied* to ensure that the municipality is not held liable solely for the actions of its employee." *Id.* at 405 (emphasis added); *see also Soltesz v. Rushmore Plaza Civic Ctr.*, 847 F.3d 941, 947 (8th Cir. 2017) ("The Supreme Court has set a high bar for establishing municipal liability under § 1983.")

### 1.     Custom and Failure to Train

In Count IX of their Complaint, the Burbridges allege the existence of "policies or customs, practices and usages that are so pervasive that they constitute the policies of [the City], that caused the constitutional deprivations of Drew and Jennifer Burbridge." Doc. 70, ¶ 141. Count IX further alleges that the City's "training and program [sic] was not adequate to train its officers and officials to properly handle reoccurring situations like the one involving Drew and

Jennifer Burbridge".   *Id.* ¶ 142.   The Court grants summary judgment for the City on Count IX

because the Burbridges have failed to show the existence of any policy, custom, or inadequate

training program, much less shown that any such policy, custom, or training program was the

"moving force" behind any constitutional violation.

"[I]n order for municipal liability to attach, individual liability first must be found on an

underlying substantive claim".   *Brockinton v. City of Sherwood, Ark.*, 503 F.3d 667, 674 (8th Cir.

2007); *see also Schulz v. Long*, 44 F.3d 643, 650 (8th Cir. 1995) ("a municipality may not be held

liable on a failure to train theory unless an underlying Constitutional violation is located").   As

discussed above, the only constitutional claims against the Defendant officers that survive

summary judgment are Drew's § 1983 claim for excessive force and his associated claims of First

Amendment retaliation and civil conspiracy.   *See* Sections II.A.3-5, *supra*.   Accordingly, the

Burbridges must show that any policy, custom, or inadequate training program was the moving

force behind *these* alleged constitutional violations.   *Brockinton*, 503 F.3d at 674.

The Burbridges have offered no evidence that the City has an official policy encouraging

or condoning the use of excessive force.[17]   Instead, the Burbridges argue that prior incidents of

the SLMPD using pepper spray without warning are evidence of an unofficial custom.   Doc. 100,

pg. 35-36.   To establish municipal liability based on an unofficial custom, the Burbridges must

show "(1) existence of a continuing, widespread, persistent pattern of unconstitutional

misconduct" by the municipality's employees; "(2) deliberate indifference to or tacit authorization

of such conduct" by the municipality's officials after notice of the misconduct; and (3) the pattern

of misconduct was the "moving force" behind the plaintiff's injury.   *Johnson v. Douglas Cty.*

*Med. Dep't*, 725 F.3d 825, 828 (8th Cir. 2013); *see also Mettler*, 165 F.3d at 1204.

---

[17] To the contrary, the Burbridges' own evidence shows that SLMPD has an official policy strictly regulating when pepper spray and other chemical agents may be used.   Doc. 100-28.

The Burbridges offer evidence of numerous other incidents in which SLMPD officers used pepper spray without warning on unresisting protestors.[18]   Multiple incidents of misconduct may establish the existence of a custom "if some evidence indicates that the incidents occurred over a course of time sufficiently long enough to permit notice of, and then deliberate indifference to or tacit authorization of, the conduct by policymaking officials."   *Johnson*, 725 F.3d at 828.   Here, nearly all of the other incidents also occurred after the *Stockley* verdict during the weekend of September 15-17, 2017, and the majority occurred on September 17, 2017—the same night of the Burbridges' arrest.   These incidents cannot support a finding of "deliberate indifference" or "tacit authorization" of the alleged behavior by the City's policymaking officials.   The Burbridges failed to produce any evidence that policymaking officials had notice of any of these incidents. And even if evidence of notice existed, the September 15-17 incidents are simply too close in time to the Burbridges' arrest to show "deliberate indifference" or "tacit authorization."   *See Johnson*, 725 F.3d at 829 (affirming summary judgment where plaintiffs offered no evidence that policymaking officials received notice of alleged violation and made a deliberate choice to ignore it "all in the course of [a] few hours").

In addition to numerous incidents the weekend of September 15-17, 2017, the Burbridges also offer evidence of two or three earlier incidents of SLMPD officers using chemical agents against nonviolent protestors, in 2014 and 2015.[19]   The Burbridges must show "the existence of a continuing, widespread, persistent pattern of unconstitutional misconduct" by the City's employees.   *Mettler*, 165 F.3d at 1204; *see also Brown*, 520 U.S. at 404.   Because a municipality

---

[18]  Docs. 100-7,100-8, 100-9, 100-10, 100-11, 100-12, 100-13, 100-14, 100-15, 100-16, 100-29, 100-30, 100-31, 100-32, 100-33, 100-37, 100-38, 100-39, 100-40, 100-44, 100-46.

[19] Plaintiffs offer the declarations of Maleeha Ahmad and Steven Hoffman.   Ms. Ahmad states that SLMPD officers used chemical agents on her without warning "near the intersection of Arsenal and Grand in late 2014."   Doc. 100-29, ¶ 19.   Mr. Hoffman states that he observed SLMPD officers use chemical agents without warning "near the intersection of Arsenal and Grand in St. Louis City" in "November 2014."   Doc. 100-40, ¶¶ 29-30.   It is unclear from the record whether Ms. Ahmad and Mr. Hoffman are describing the same or separate incidents.   Mr. Hoffman also states that he observed SLMPD officers use chemical agents without warning in a separate incident in August 2015. Doc. 100-40, ¶¶ 31-32.

cannot be liable on a *respondeat superior* theory, "the pattern of unconstitutional conduct must be so pervasive and widespread so as to have the effect and force of law." *Brewington v. Keener*, 902 F.3d 796, 801 (8th Cir. 2018) (internal quotations and citations omitted). The Eighth Circuit has not directly addressed the quantum of "continuing, widespread, persistent" conduct a plaintiff must show to survive summary judgment, though it has held that isolated incidents do not suffice and that evidence of "many" incidents does establish liability. *Wedemeier v. City of Ballwin*, Mo., 931 F.2d 24, 26 (8th Cir. 1991); *Harris v. City of Pagedale*, 821 F.2d 499, 504 (8th Cir. 1987). The Fifth Circuit held that when a plaintiff uses prior incidents to prove a pattern, the prior incidents "must have occurred for so long or so frequently that the course of conduct warrants the attribution to the governing body of knowledge that the objectionable conduct is the expected, accepted practice of [the municipality's] employees." *Webster v. Houston*, 735 F.2d 838, 842 (5th Cir. 1984) (*en banc*); *see also Pineda v. City of Houston,* 291 F.3d 325, 329 (5th Cir. 2002), (holding eleven incidents of police misconduct failed to establish an unconstitutional pattern).

Without determining exactly how many instances would suffice to show a pattern of misconduct, the Court finds that the Burbridges' evidence fails to do so. The Burbridges have offered no evidence that policymaking officials had notice of the incidents in 2014 or 2015. Further, the Court finds that two or three incidents, occurring nearly a year apart and two years before any of the events at issue in this case, do not constitute a "continuing, widespread, persistent pattern." *Mettler*, 165 F.3d at 1204. Nor does the evidence show a pattern of unconstitutional conduct "so pervasive and widespread so as to have the effect and force of law." *Brewington,* 902 F.3d at 801. Accordingly, the Burbridges have failed to establish the existence of an unofficial SLMPD custom of encouraging or condoning the use of excessive force.

The Burbridges also argue that the City's inadequate training of the Defendant officers caused the officers to use excessive force during Drew's arrest. Doc. 100, pg. 41. As evidence

of the City's allegedly deficient training, the Burbridges offer testimony from the officers showing: 1) Sgt. Rossomanno carried a mace fogger but did not receive specialized training beyond what he would get for regular mace; 2) Officer Rachas received no specialized training in chemical weapons or the use of force other than his general training; 3) Officer Burton could not recall any special or additional training in advance of the *Stockley* verdict; and 4) Officer Biggins' training in crowd control consisted of his initial training at the police academy and one to two additional days per year.   Doc. 100, pg. 25-26.   The Court finds this evidence insufficient to establish municipal liability based on failure to train.   *See Ambrose v. Young*, 474 F.3d 1070, 1079-80 (8th Cir. 2007) ("For liability to attach, [Plaintiffs] must show 'the need for more or different training is so obvious, and the inadequacy so likely to result in the violation of constitutional rights, that [Defendant] can reasonably be said to have been deliberately indifferent to the need.'") (quoting *City of Canton*, 489 U.S. at 390).

The record shows that all of the Defendant officers received some training on the use of force through their police academy training.   Officer Biggins and Sgt. Rossomanno, who were members of the Civil Disobedience Teams, received additional training on the use of force and crowd control.   Doc. 100-19 at 22:4-23:1; Doc. 100-34 at 13:23-14:3.   From August 2014 until January 2018, Sgt. Rossomanno was one of the coordinators of the Civil Disobedience Teams and was responsible for recruiting for the teams and developing training.   Doc. 100-19 at 18:1-11; 47:6-19.   Between November 2014 and January 2018, the Civil Disobedience Teams received quarterly training on crowd control and protest response.   *Id*. at 20:12-21:14.   Taken in the light most favorable to the Burbridges, the evidence cannot reasonably support a finding that SLMPD or the City were "deliberately indifferent" to a need for more or different training.   *Ambrose*, 474 F.3d at 1080.

## 2.      Civil Conspiracy – Municipal Liability

The City moves for summary judgment on the Burbridges' civil conspiracy claim[20] arguing 1) that the intracorporate conspiracy doctrine bars the Burbridge's claim, 2) that Plaintiffs have offered no evidence that Defendants reached an agreement to deprive the Burbridges' civil rights, and 3) that the conspiracy claim must fail in the absence of any underlying constitutional violation.   Because Drew Burbridge's § 1983 excessive force claim survives summary judgment, the City's argument that no underlying constitutional violation exists is premature.   *See* Section III.A.5, *supra*; *White*, 519 F.3d at 814.

The Court next considers the City's argument that the intracorporate conspiracy doctrine bars the Burbridges' civil conspiracy claim .   The intracorporate conspiracy doctrine provides that "a local government entity cannot conspire with itself through its agents acting within the scope of their employment."   *Kelly v. City of Omaha, Neb.*, 813 F.3d 1070, 1078 (8th Cir. 2016). Government agents' actions can come within the scope of their employment duties "even though [a] complaint alleges improprieties in the execution of these duties." *Id.*   The Burbridges argue that the intracorporate conspiracy doctrine should not apply here because the Eighth Circuit has only applied the doctrine to conspiracy claims under 42 U.S.C. § 1985, and because some courts have held that the doctrine does not apply to protect conspiracies to commit excessive force under § 1983.[21]   The Eighth Circuit has not addressed whether the intracorporate conspiracy doctrine

---

20  The Burbridges assert their civil conspiracy claim (Count XI) only against the police-officer Defendants. However, the Defendant officers are named both in their individual and official capacities.   The Burbridges' claims against the officers in their official capacities are claims against the City.   *See Kentucky v. Graham*, 473 U.S. 159, 165 (1985).

21  *See Golden v. Moutray*, No. 4:17 CV 284 DDN, 2018 WL 1784395, at *4 (E.D. Mo. Apr. 13, 2018) (collecting cases).   The Court is also aware that numerous courts in this District have declined to apply the intracorporate conspiracy doctrine to other § 1983 claims arising out of the *Stockley* protests.   *See, e.g., Thomas v. City of St. Louis, Missouri*, No. 4:18-CV-01566 JAR, 2019 WL 3037200, at *5 (E.D. Mo. July 11, 2019); *Faulk v. City of St. Louis, Missouri*, No. 4:18CV308 JCH, 2019 WL 3304716, at *5 (E.D. Mo. July 23, 2019); *Aldridge v. City of St. Louis, Missouri*, No. 4:18-CV-1677 CAS, 2019 WL 1695982, at *8 (E.D. Mo. Apr. 17, 2019); *Laird v. City of Saint Louis, Missouri*, No. 4:18-CV-01567-AGF, 2019 WL 2647273, at *5 (E.D. Mo. June 27, 2019); *Newbold v. City of Saint Louis, Missouri*, No. 4:18CV1572 HEA, 2019 WL 3220405, at *6 (E.D. Mo. July 16, 2019).   Each of these cases considered the intracorporate conspiracy doctrine in the context of a motion to dismiss, and determined that

applies to § 1983 conspiracy claims.   The Court need not reach that question in this case because the Burbridges have failed to offer any evidence that the City entered into an agreement to deprive the Burbridges' civil rights.

The first element of a § 1983 conspiracy claim is evidence that "the defendant conspired with others to deprive [the plaintiff] of constitutional rights."   *White*, 519 F.3d at 814.   In opposition to Defendants' motion for summary judgment, the Burbridges argue that "[t]here is sufficient evidence from which a jury could determine that the *officers* conspired with one another."[22] Doc. 100, pg. 51 (emphasis added).   But evidence that the officers conspired with one another does not prove that the City conspired with the officers.   *Monell*, 436 U.S. at 691.   The Court has reviewed the voluminous record and finds no evidence that the City conspired with the Defendant officers to deprive the Burbridges of civil rights.   Further, "[i]t is not a court's obligation to search the record for specific facts that might support a litigant's claim." *Johnson v. City of Shorewood, Minnesota*, 360 F.3d 810, 817 (8th Cir. 2004).   Of all the evidence for a conspiracy cited in the Burbridges' opposition brief, only one fact is arguably attributable to the City.   The Burbridges argue that "Defendants [failure or refusal] to identify the John Doe Officer who assaulted Jennifer" is evidence that the Defendants conspired together.   Doc. 100, pg. 51. The Court doubts that this threadbare fact would be sufficient to create a genuine issue of material fact, even under the lenient standard applicable to conspiracy claims.  *See White*, 519 F.3d at 816. But the Court need not reach that question, because the Court has already determined that Jennifer's § 1983 excessive force claim does not survive summary judgment.   *See* Section III.A.3, *supra*.   Thus, the City's alleged refusal to identify the John Doe officer is not connected to any viable constitutional claim.   Without an underlying constitutional violation, there can be no

---

application of the doctrine was inappropriate at the pleading stage.
[22] Consistent with this assertion, the Court has denied summary judgment for the Defendant officers on the Burbridges' civil conspiracy claim.

conspiracy to deprive civil rights.   *White*, 519 F.3d at 814.   Accordingly, the Court grants the

City's motion for summary judgment on the Burbridges' civil conspiracy claim.

> **D.      Fourth Amendment Unlawful Search**

The Court next considers Jennifer's claim that the City violated her Fourth Amendment

rights by subjecting her to a pregnancy test against her will.   Doc. 70, ¶ 111.   A "search" within

the meaning of the Fourth Amendment occurs when "'the government violates a subjective

expectation of privacy that society recognizes as reasonable.'" *Arnzen v. Palmer*, 713 F.3d 369,

372 (8th Cir.2013) (quoting *Kyllo v. United States*, 533 U.S. 27, 31–33 (2001)).   However, jail

administrators have wide latitude to adopt search procedures at intake for purposes of safety and

security.   *See, e.g., Florence v. Bd. of Chosen Freeholders of Cty. of Burlington*, 566 U.S. 318,

330 (2012) (jail administrators may require strip search at intake, even of detainees arrested for

minor offenses).   Courts must defer to the judgment of jail administrators on issues of security

absent "substantial evidence" that their response to the situation is exaggerated.   *Id.* at 322-23.

The Burbridges have offered no evidence that a pregnancy test requirement for female detainees is

unnecessary or unreasonable.

For purposes of this Motion, Defendants do not dispute that an unidentified male

corrections officer opened the cell door and looked in while Jennifer was taking her pregnancy

test.   *See* Doc. 101.   The Court's review of the record reveals no explanation or justification for

the officer's conduct.   However, the Burbridges have not named the unidentified corrections

officer as a defendant.   Instead, Jennifer asserts this claim against the City.   But the Burbridges

have offered no evidence that the City has a policy or custom of permitting male correction

officers to observe female detainees take pregnancy tests.   *See* <u>Wedemeier</u>, 931 F.2d at 26 (an

isolated incident of misconduct is "insufficient to establish municipal policy or custom").

Accordingly, the Burbridges have failed to establish any basis under which the City may be liable under § 1983 for the unidentified officer's conduct.   *Monell*, 436 U.S. at 690-691.

E.        **Fourteenth Amendment Procedural Due Process**

Finally, the Court considers Defendants' motion for summary judgment on the Burbridges' Fourteenth Amendment procedural due process claim (Count IV), which challenges the constitutionality of St. Louis City Ordinances 15.52.010 and 17.16.275.   Doc. 70, at ¶ 119.   The Burbridges argue that the ordinances are "unconstitutional on their face and as applied".   Doc. 100, pg. 46.   "A statute or ordinance violates the Due Process Clause 'if it fails to give fair warning that the allegedly violative conduct was prohibited.'"   *Stahl v. City of St. Louis, Mo.*, 687 F.3d 1038, 1040 (8th Cir. 2012) (quoting *Qwest Corp. v. Minnesota Pub. Util. Comm'n*, 427 F.3d 1061, 1068 (8th Cir. 2005)).   "Such a law offends due process because it 'may fail to provide the kind of notice that will enable ordinary people to understand what conduct it prohibits.'" *Id.* (quoting *City of Chicago v. Morales*, 527 U.S. 41, 56 (1999)).

The Supreme Court has noted that facial challenges are "disfavored." *Washington State Grange v. Washington State Republican Party*, 552 U.S. 442, 450 (2008).   Accordingly, "a facial challenge must fail where the statute has a plainly legitimate sweep."   *Id.* at 449.   The Court finds that the challenged ordinances are facially valid.   St. Louis City Ordinance 15.52.010 (the "Unlawful Assembly Ordinance") criminalizes only conduct, i.e., "[acting] in concert to do any unlawful act with force or violence."   St. Louis City Ordinance 17.16.275 (the "Impeding Traffic Ordinance") was amended in 2013, after the Eighth Circuit invalidated a prior version.   *See Stahl*, 687 F.3d at 1041.   In invalidating the earlier version of the Impeding Traffic Ordinance, the Eighth Circuit declared, "So long as the ordinance is clear and provides fair notice as to what conduct is deemed likely to cause a traffic problem, these regulations do not offend due process."

*Id.*   The Court finds that the current version of the Impeding Traffic Ordinance is clear and provides fair notice as to what conduct is proscribed.   The ordinance provides in relevant part:

> No person, or persons congregating with another or others, shall stand or otherwise position himself or herself in any public place in such a manner as to obstruct, impede, interfere, hinder or delay the reasonable movement of vehicular or pedestrian traffic.

St. Louis City Ordinance 17.16.275.   Thus, the Court finds that both challenged ordinances are facially valid.

In support of their claim that the ordinances are unconstitutional as applied in this case, the Burbridges offer evidence that SLMPD has a policy or custom of allowing individual police officers unfettered discretion to declare an unlawful assembly, even in the absence of force or violence.   Doc. 100-18, 61:17-25, 62-64.   Accepting the Burbridges' evidence as true, and assuming for the sake of argument that such a policy or custom exists, the Burbridges have not shown that any such policy or custom caused the ordinances to be applied in an unconstitutional manner in this case.   Leyshock, the incident commander in charge of SLMPD response to the *Stockley* protests, made the determination to declare an unlawful assembly, upon reports that protestors were throwing objects at police officers.   Acting on Leyshock's orders, Sgt. Rossomanno declared an unlawful assembly and issued dispersal orders.   Thus, any alleged custom or policy of allowing SLMPD officers unfettered discretion to declare unlawful assemblies was not the "moving force" behind the application of the challenged ordinances in this case.   *See Monell*, 436 U.S. at 694.   Because the Burbridges have failed to show that a custom or policy was the moving force behind the alleged due process violation, the Burbridges cannot establish municipal liability under § 1983.   *Id.*   Further, the Court grants summary judgment for the Defendant officers on Count IV because Leyshock (who is not a defendant in this action) made the determination to declare an unlawful assembly.

Accordingly,

**IT IS HEREBY ORDERED** that Defendants' Motion for Summary Judgment [89] is GRANTED in part and DENIED in part as follows:

The Court grants summary judgment for Defendant City of St. Louis on all counts of Plaintiffs' Complaint.

The Court grants summary judgment for Defendants Rossomanno, Burton, Rachas, and Biggins in their official capacities on all counts of Plaintiffs' complaint.

The Court grants summary judgment for Defendants Rossomanno, Burton, Rachas, and Biggins in their individual capacities on all counts of Plaintiffs' complaint, except for Plaintiff Drew Burbridge's excessive force claim (Count III), Plaintiff Drew Burbridge's First Amendment retaliation claim related to Defendants' alleged use of excessive force (Count II), Plaintiff Drew Burbridge's claim of conspiracy to deprive civil rights related to Defendants' alleged use of excessive force (Count XI), and Plaintiff Drew Burbridge's state law claim of assault and battery (Count V).

**IT IS FURTHER ORDERED** that all claims in Plaintiffs' Complaint asserted against the unidentified "John Doe" Defendant are DISMISSED without prejudice.

So Ordered this 20th day of December, 2019.

_____
**STEPHEN R. CLARK**
**UNITED STATES DISTRICT JUDGE**